# GARY MAYNARD SHOEMAKER AND BENJAMIN KATZ v. STATE OF MARYLAND

[No. 814, September Term, 1981.]

*Decided October 6, 1982.*

464

The cause was submitted on briefs to MOYLAN, MOORE and *MACDANIEL, JJ.

Submitted by *Howard L. Cardin* and *Cardin & Gitomer, P.A.* for appellants.

Submitted by *Stephen H. Sachs, Attorney General, Alexander L. Cummings, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Prevas, Assistant State's Attorney for Baltimore City,* for appellee.

---

* *Reporter's Note:* MacDaniel, J., participated in the hearing of this case and in the conference thereon, but retired before the opinion was filed.

MOYLAN, J., delivered the opinion of the Court.

A long-range and highly sophisticated investigation into a widespread prostitution organization, operating behind the front of a series of massage parlors, culminated in the conviction of the appellants, Gary Maynard Shoemaker and Benjamin Katz, on eleven related conspiracy counts and twenty-nine counts of receiving the earnings of prostitutes. Five of the seven appellate contentions now raised deal with the constitutionality of a search and seizure conducted in Anne Arundel County on August 30, 1979 at the home of the appellant Shoemaker. Those search and seizure issues are as follows:

1. Whether probable cause existed for the issuance of the warrant;
2. Whether that probable cause was stale;
3. Whether the search warrant was invalid because it was based upon facts not within the personal knowledge of the applicant;
4. Whether the warrant was, on its face, an unconstitutional general warrant; and
5. Whether evidence was seized under the warrant that had not been particularly described.

Both the affidavit for the search warrant now in question and the evidence at the trial on the merits revealed an extensive prostitution operation both in Baltimore City and in a Hagerstown branch office. The Kingpin of the operation was a co-conspirator, Charles "Eddie" Elmore, who was indicted along with the appellants but entered into a negotiated plea of guilty. The appellants were shown to be partners and high-level functionaries in the operation. The conspiracy also embraced a general manager, five local managers at four of the retail outlets, and a legion of unlicensed masseuse-prostitutes.

On August 30, 1979, a series of simultaneous searches were executed at, *inter alia,* (1) the Inner Circle Health Spa, in Baltimore City; (2) the Geisha House, in Baltimore City; (3) the Cat's Pajamas, in Baltimore City; (4) the home of the

appellant Katz, in Baltimore City; and (5) the home of the appellant Shoemaker, in Anne Arundel County. We are concerned on this appeal only with the search executed at the home of the appellant Shoemaker in Anne Arundel County.

## The Standing of the Appellant Katz

The State now challenges, belatedly we hold, the standing of the appellant Katz to object to the search of the home of the appellant Shoemaker. Had such a challenge been timely and unequivocally raised, it might well have prevailed. Although such a challenge was raised, successfully we note, with respect to two other codefendants, it was not clearly raised (unless arguably by the most oblique of generalities) with respect to the appellant Katz. Since the State acquiesced in reaching the Fourth Amendment merits with respect to the appellant Katz and since the very avoidance of unnecessary litigation which is a key purpose of the standing requirement was not accomplished, the State will not be heard to raise the issue now. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Combs v. United States,* 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972). The victory is, however, hollow since, even granted standing by default, Katz loses, along with Shoemaker, on the Fourth Amendment merits.

## The Probable Cause for the Issuance of the Warrant

It was a Baltimore City jury, presided over by Judge Peter D. Ward, that found the appellants guilty. It was also Judge Ward, presiding at the pretrial suppression hearing, who found that there was probable cause to support the issuance of the warrant for the search of Shoemaker's home in Anne Arundel County. We hold that Judge Ward was eminently correct in that finding.

Our discussion and our holdings on the various Fourth Amendment issues here involved are confined to the specific subissues raised and argued by the appellants. Those

holdings, therefore, intimate nothing with respect to other possible issues (if there be any) not specifically raised before us.

The warrant application here in question was a model of careful detail and is worthy of emulation throughout the law enforcement ranks. The primary applicant for the warrants that were to issue in Baltimore City was Detective Eric P. Husok, a two-year veteran of the Vice Unit of the Criminal Investigation Division of the Baltimore City Police Department. At the outset of his detailed, sixteen-page recitation of the probable cause that had been gathered by him and other members of the police team, he set forth his expertise as a vice investigator. He held a Bachelor of Science degree in Criminal Justice, was a graduate of the Institute of Contemporary Corrections and Behavioral Sciences, had received special training from the Federal Drug Enforcement Agency, and had attended departmental in-service training seminars conducted by the Criminal Investigation Division with heavy emphasis on the subject of probable cause in support of search and seizure warrants. He had participated in over thirty vice raids and in the arrest of over two hundred persons for vice-related offenses.

The applicant for the Anne Arundel County warrant now in issue was Detective Gary L. Barr, a five-year veteran with the Anne Arundel County Police Department. At the outset of his separate application, he recited his own expertise. That included intensive on-the-job training in the field of illegal prostitution activities and operations. Detective Barr had also completed courses in vice investigation sponsored by the Atlantic City Police Department and the University of Delaware, and had attended a specialized school con-ducted by the Baltimore County Police Training Center on telephonic interceptions. Detective Barr holds an Associate of Arts degree in Law Enforcement and has been certified by the Maryland Police Training Commission as an instructor in the areas of illegal gambling, organized crime and other vice-related investigations. He recited his familiarity with the *modus operandi* of prostitution rings in the State of

Maryland. He incorporated into the application for the warrant in Anne Arundel County the full sixteen-page application from Baltimore City as well as other supporting documents.

The competence of Detective Husok and Detective Barr to interpret what might otherwise be ambiguous observations was well established. It is undisputed that in measuring probable cause, the warrant-issuing judge and the reviewing judge may give significance to such expert interpretation.

Although there was significant corroborative data, which will be hereinafter discussed, the heart of the probable cause in this case was the information related to the police by one William Larsen. He had been intimately involved over a period of years with the criminal activities under investigation. He had worked for Charles Elmore for approximately four years and had served as either president or managing officer of several of the Maryland corporations that operated the massage parlors and body painting studios involved in this case. Since William Larsen did not appear personally before the warrant-issuing judge but passed his information along through the conduit of Detective Husok, he was classically a "secondary source" within the contemplation of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The appellants here have chosen to attack the probable cause for the search of Shoemaker's home by asking whether William Larsen, as a secondary source, passes muster according to the two-pronged test of *Aguilar.* That now classic test established two distinct requirements:

> "Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose

identity need not be disclosed, . . . was 'credible' or his information 'reliable.' " 378 U.S. at 114-115.

That test simply points to the two constituent parts of the decisional process that always must take place whenever a judge is required to make a finding of fact, whether on the subject of probable cause, whether on the subject of guilt or innocence or whether on any other subject. The judge must (1) assess the credibility of the source of information and (2) determine whether the source is offering competent information or just passing along some unsubstantiated rumor or flight of fancy. The two prongs of *Aguilar* — the veracity prong and the basis of knowledge prong — are simply a formal way of referring to the very fundamental questions that a judge, consciously or subconsciously, always asks himself about a witness, an affiant, an informant, or any other source of information:

(1) Why should I believe him?
(2) Does he know what he is talking about?

We first spoke of the essential nature of this analysis in *Dawson v. State,* 11 Md.App. 694, 698, 276 A.2d 680:

> "Whether the information being evaluated is the direct observation of the affiant or is hearsay information, the issuing magistrate is required to perform the same intellectual surgery. In determining the existence *vel non* of probable cause, the magistrate must make two distinct determinations. The number and the nature of these determinations do not vary, whether the specimen being analyzed is direct observation or hearsay information. He must:
>
> (1) Evaluate the truthfulness of the source of the information; and
> (2) Evaluate the adequacy of the factual premises furnished by that source to support the validity of the source's conclusion."

a. *The Basis of Knowledge of the Informant William Larsen*

The basis-of-knowledge prong seeks to avoid the danger that even a reliable informant might be passing on, through the conduit of the police affiant, a bit of barroom gossip or a mere underworld rumor. In probing for a more sure basis of knowledge, we seek some assurance that the informant speaks from personal knowledge, that he is passing along what he perceived with his senses.

The secondary source, William Larsen, passes that basis-of-knowledge test in this case many times over. Our only hesitancy in reciting, even by way of partial summary, the richness of that knowledge and of that basis of knowledge in this case is our fear that an uncritical reader will mistake this mere description of the abundance before us as an unrealistically high standard by which future recitations should be judged. To dispel that notion in advance, we point out that it will be exceedingly rare that an application remotely approaches this one in establishing the basis of the informant's knowledge.

Larsen went to work for Elmore in approximately 1975. His initial job was to transport females from the Cat's Pajamas in Washington, D.C. to various private residences, motels and hotels where they were to meet customers who had phoned in for massages. From conversations with Elmore and with the girls themselves, he learned that the primary purpose of these outcalls was to engage in acts of prostitution with the customers. Shortly thereafter, Larsen became the manager of the Washington, D.C. Cat's Pajamas, where he had the daily opportunity to observe the activities of the females who were to engage in prostitution. Elmore spoke openly to him about prostitution as the primary function of the business, and they conspired regularly as to methods to avoid police interference. When in 1977 Elmore was arrested for bribery, Larsen become the general manager and the president not simply of the Washington operation but of (1) H.N., Inc., which operated the Geisha House in Hagerstown; (2) General Promotions, which operated the Cat's Pajamas in Baltimore and in Washington, D.C.; (3)

Universal Promotions, Ltd., which operated the Cat's Pajamas in Baltimore; and (4) Circle Spas, Inc., which operated the Inner Circle in Baltimore.[1] With those expanded responsibilities, Larsen traveled to all of the establishments in question, supervised the hiring and firing of the masseuses and saw to the proper collection, through local managers, of the money and of the business records. He was in regular contact with both Elmore and Elmore's partner, the appellant Shoemaker.

Larsen described the interviewing process for prospective employees. The "girls" were asked what they thought their duties would involve. When they acknowledged that commercial sex was an integral part of it, they were asked to engage in an act of sex with the interviewers to help insure that the prospective employees were not undercover policewomen. At all of the establishments in question, the employees received no salary but only "tips." The initial fee from the customer, collected in cash or by Master Charge or Visa credit card, was all kept by the establishment. At three of the retail outlets, the initial service delivered was a massage; at the Hagerstown outlet, it was the opportunity for the customer to engage in "body painting" upon the naked recipient of the paint; and at the Washington Cat's Pajamas, it was a "social encounter." The females would then solicit for various acts of prostitution in return for "tips." This was their only remuneration.

Larsen then narrowed the focus and pinpointed his observations with respect to each of the five customer outlets under investigation. With regard to the Geisha House in Hagerstown, Larsen described how the customer is met by the local manager, Russell Eugene Frye. He detailed how the money for the body painting session is taken from the customer and noted on a standard daily activity form. He described how the money is then deposited in a small safe in the front room, a safe to which the local manager has no key. He detailed the storage of the daily activity forms and

---

1. The corporate veil, even when partially pierced, was at best translucent and not fully transparent. It revealed at least, however, a facile corporate "shell game."

of the charge account slips. He repeated numerous conversations with female employees at that establishment, with the local manager, Frye, and with both Elmore and Shoemaker about that establishment.

With reference to the Cat's Pajamas in Baltimore, Larsen described his numerous visits to that establishment and gave a detailed description of its physical appearance and of the procedure for logging in the customers and accepting payment. He described numerous conversations with Elmore, Shoemaker and the female employees at this establishment, confirming and regulating engagement in acts of prostitution. He recounted how this establishment is also the base of operations for an outcall service.

With respect to the Inner Circle Health Spa, Larsen recited with the same detail the same aspects of that operation. Larsen gave similarly detailed information with respect to the Geisha House in Baltimore and the Cat's Pajamas in Washington.

He described further how Elmore and Shoemaker always picked up in person, generally on a weekly basis, the receipts from the three Baltimore establishments. He recounted how, he, Larsen, would pick up the weekly receipts from Washington and Hagerstown and deliver them in person to either Elmore or Shoemaker. He described, with respect to the deliveries to Shoemaker, trips to Shoemaker's home in Anne Arundel County. He described the small office in that home and the desk wherein Shoemaker kept the records (and no other records) from this business. He described the bonuses he would receive from Shoemaker, always in denominations under $100, and of how the $100 bills were taken by Shoemaker for deposit in a safe deposit box at a Glen Burnie bank. Larsen accompanied Shoemaker to the safe deposit box on several occasions and observed that it was full of $100 bills.

Larsen also detailed his association with the appellant Katz, the bookkeeper for the massage parlor operation. He described how Katz was fully knowledgeable about the whole nature of the business and how he participated as

more than a bookkeeper. He recounted how Katz described his own efforts as one of keeping the books in such a manner as to conceal money illegitimately obtained. He described several other techniques designed by Katz to evade both taxes and criminal investigation.

On a full-time basis over a period of four years, the informant Larsen could not have had a more sure or direct basis of knowledge for the information he passed on, through Detective Husok, to the warrant-issuing judge.

b. *The Veracity of the Informant William Larsen*

*Aguilar's* veracity prong, by way of contrast, is concerned not with how the informant knows the thing he describes but with whether the informant is worthy of belief. In the case at bar, three separate avenues move us in the direction of the informant Larsen's believability. The first is that Larsen is named and identified. The healthy skepticism of *Aguilar* and *Spinelli* on the subject of believability is aimed at the unnamed informer hiding in his cloak of anonymity. It is the professional stool pigeon, trading information for a few dollars or a cheap fix, who compels our closer constitutional scrutiny. In dealing with this aspect of the problem, we noted in *Dawson v. State, supra,* at 11 Md.App. 699:

> "[I]n dealing with a named source, the very naming of the source and the relationship of the source to the observed information may go a long way (or even be sufficient unto itself), under the facts of a particular case, to establish the credibility of that source or the reliability of his information. *Kapler v. State,* 194 Md. 580; *Ward v. State,* 9 Md.App. 583, 591-592; *Grimm v. State,* 6 Md.App. 321, 328. See also *Taylor v. State,* 238 Md. 424; *Jones v. State,* 242 Md. 95; *Knight v. State,* 7 Md.App. 282."

Although the naming and identifying of the secondary source in this case helps, it is probably not in this case enough standing alone to establish veracity. What we observed in *Dawson* and in like contexts about the

sufficiency of naming the informant was with respect to those secondary sources who were "citizen informers," with no motive to lie, rather than with respect to those drawn from the criminal milieu. The informant Larsen in this case was not a citizen-informer but was a fully culpable participant in the criminal activities. His revelations to the police were inferentially in return for some sort of immunity and they invite skepticism, though not to the degree they might if he had remained totally anonymous.

That brings us to the second avenue pointing toward his believability. His relevations constituted a significant declaration against penal interest. The plurality opinion of Chief Justice Burger in *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), argue that a declaration against penal interest, made by one who had participated in the crime in question, could in and of itself establish the probable veracity of the source. Although, as a mere plurality opinion, *United States v. Harris* was not constitutionally binding, Maryland has been persuaded by it and has independently adopted the view espoused by the *Harris* plurality. *Merrick v. State,* 283 Md. 1, 389 A.2d 328.

Although these two avenues in combination would probably suffice to satisfy *Aguilar's* veracity prong, it is not necessary in this case to make so close a decision. We have bountifully available a third broad avenue pointing toward veracity, that of independent police verification. When a structural flaw inheres in *Aguilar's* veracity prong, *Spinelli* makes available to us the buttressing technique of "independent police verification." The Supreme Court described the technique, at 393 U.S. 415:

> "If the tip is found inadequate under *Aguilar,* the other allegations· which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as

trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?"

We ourselves spoke of this technique in *Stanley v. State,* 19 Md.App. 507, 529, 313 A.2d 847:

"When independent police observations have verified part of the story told by an informant, that corroboration lends credence to the remaining unverified portion of the story by demonstrating that the informant has, to the extent tested, spoken truly. *Hignut v. State,* 17 Md.App. 399, 411, 303 A.2d 173. The verification helps to demonstrate his 'credibility.' Present good performance shows him to be probably 'credible' just as surely as does past good performance."

In this case, the independent verification of Larsen's story was massive. Records were appended to the warrant application from the Department of Motor Vehicles, confirming the addresses at which both Elmore and Shoemaker lived and confirming the descriptions of the automobiles they drove. Articles of Incorporation of the various corporations used in this operation were also collected by the police and appended to the application. They corroborated fully the corporate structure recited by Larsen. A letter from the appellant Katz's father confirmed Katz's place of business.

The police also recounted in the application for the warrant an independent interview with Russell Eugene Frye, the local manager of the Geisha House in Hagerstown. He described the method of payment by the customers for a body painting session, the recordkeeping procedure and procedure for depositing money in the safe. He described the weekly pick-up of the money by Larsen, Shoemaker or Elmore. Frye confirmed in every detail the story told by Larsen, including his personal conversations and observations that every female employed at the Hagerstown establishment engages in prostitution with customers.

Again by way of independent corroboration with respect to the Cat's Pajamas in Baltimore, the Baltimore City Police

Department arrested a total of three females for prostitution when they were operating on an outcall basis from the Cat's Pajamas. In 1979 as well, the Baltimore City Police Department arrested a female operating on an outcall basis from the Inner Circle for prostitution and arrested another female out of the same establishment for violating a local ordinance for operating as an unlicensed masseuse out of a massage parlor which also was operating without a license. In addition to the Baltimore City arrests, the Anne Arundel County Police Department arrested in 1979 four females for prostitution operating out of the Inner Circle. Quite independently, the Baltimore County Police Department arrested two females for prostitution operating out of the Inner Circle.

Detective Husok, moreover, participated in two prostitution arrests at the Geisha House in Baltimore in 1978. In 1979, the Baltimore City Police made an additional arrest there for prostitution and three additional arrests for operating as unlicensed masseuses in violation of the Baltimore City ordinance. In addition to his earlier corroboration about the Hagerstown activities, Russell Frye described a visit to Elmore's home and the installation of a locking device on one of the business establishment's safes, which he installed at Elmore's request.

By way of final corroboration, the affiant appended to the warrant application the criminal record of Charles Elmore showing a regular pattern of arrests and convictions for, among other crimes, running a bawdy house, maintaining a disorderly house, maintaining a house for prostitution, bribing a public official, and transporting for purposes of prostitution. Although such a history would be inadmissible on the merits of guilt or innocence, no such constraints bind the judge who is considering probable cause. Indeed, the theory of inadmissibility before the jury is premised not upon the fact that such a history is irrelevant but upon the diametric fact that it is too relevant.

It is clear that when the warrant-issuing judge considered the sixteen-page affidavit and all of its supporting

documents, he had ample reason to believe (1) that Larsen's story was worthy of belief and (2) that Larsen had a firm basis of knowledge. The story told by Larsen and recounted by the judge to the police, supported by all of the other independently gathered data, added up to probable cause for the issuance of the warrant here in question.

## The Staleness of Probable Cause

The warrant was applied for and issued on August 30, 1979. Detective Barr, the applicant, had met with his Baltimore City colleague, Detective Husok, and received all of the information from him on the preceding day, August 29, 1979. Turning to that information, Detective Husok met with William Larsen and received the mass of incriminating data from him during the eleven-day period of August 19 through August 29, 1979. The corporate records, the motor vehicle records and the criminal record of Elmore were obtained during this period. It was, furthermore, between August 23 and August 27, 1979 that the police met with and independently interviewed Russell Eugene Frye. A fair reading of the sixteen-page statement gives the reasonable impression that both Larsen and Frye were still working as part of the illicit operation even as they were turning State's evidence. Indeed, the very explicit statement, "Larsen advises that he was last at Elmore's residence during late August," seems to make explicit what is elsewhere implicit. Bearing in mind Newton's first law of physics that a body in motion remains in motion until acted upon by a force, we find it not unreasonable to infer that an apparently profitable and widespread commercial vice ring which had been operating continuously from 1975 through sometime in 1979 would continue to operate. A number of the arrests for prostitution made by Baltimore City, Baltimore County and Anne Arundel County police were made through 1979.

The main thrust of the appellants' contention is that Larsen did not pinpoint the time of his visits to Shoemaker's home in Anne Arundel County. We do conclude from the total context of Larsen's story that it was within the latter

two of the four-year period in question, after he had been moved up to the level of General Manager, that he made the weekly deliveries of cash to either Elmore or Shoemaker. We conclude, moreover, that these visits to Shoemaker at his home in Anne Arundel County were essentially on some regular basis over the course of these latter two years. The nature of the observations at Shoemaker's home are as significant as the time of those observations. Larsen observed that Shoemaker maintained a desk and filing cabinet which contained extensive business records, company books and checks. Shoemaker indicated to Larsen that these records were all from the massage parlor operation. Larsen observed on numerous occasions Shoemaker's placing money in the lower left-hand drawer of the desk. Larsen also described how several of his visits to Shoemaker resulted in additional trips with Shoemaker to the safe deposit box in Glen Burnie. One of these was pinpointed in time, "approximately three months prior to this date [August 29, 1979] Larsen had occasion to observe Shoemaker open the safe deposit box and observed it to be full of $100 bills."

An argument similar to the present one was made in *Andresen v. State,* 24 Md.App. 128, 331 A.2d 78. The warrant there was issued on October 30, 1972. The warrant there, as here, was for business records kept in desks and file cabinets. Some of the observations contributing to the probable cause in that case had, to be sure, been made in the summer of 1972. The heart of the appellant's contention on the evaporation of probable cause was summarized by us, at 24 Md.App. 169:

"The thrust of this subcontention is that various observations of activity on the part of the appellant made significantly prior to October 30, 1972, even if such observations indicated criminal behavior *then,* did not yield the likelihood that evidence of such crime was still present on the appellant's two business premises as late as October 30."

In rejecting the appellant's argument there, as we now reject it here, we summarized the case law here and

throughout the country and the academic literature and concluded that far more than the mere passage of time is involved in the assessment of how stale or fresh probable cause may be. What we there observed, at 24 Md.App. 172, has particular pertinence to the case at bar:

"The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed. The massive records and files of the appellant-attorney and his protean corporate extensions in this case are more akin to the latter than to the former. In terms of non-staleness, the probable cause here was still as the first dew of the morn."

Our holding on that issue was affirmed by the Supreme Court in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). It was, moreover, subsequently quoted in full by the Court of Appeals with approval as "explicat[ing] the general rule regarding stale probable cause recognized in *Clayton,* discussed in *Johnson,* applied in *Washburn,* and implied in this Court's *Edwards,*" in *Peterson v. State,* 281 Md. 309, 316-317, 379 A.2d 164. See also *Lee v. State,* 47 Md.App. 213, 422 A.2d 62.

It is obvious in this case that the crime in question was not

a "chance encounter in the night" but was rather a "regenerating conspiracy." It is obvious that the criminals here were well entrenched and not nomadic. It is obvious that the business records were not easily perishable but were rather "of enduring utility to its holder." It is obvious that the home office of Shoemaker in Anne Arundel County was a "secure operational base" and not a "mere criminal forum of convenience." If a four-year criminal business is still flourishing and if Shoemaker is still an operating partner and if Shoemaker keeps the business records at his home and if Shoemaker still lives at the same old place, it is not unreasonable to infer that the place where those business records are kept has not suddenly and inexplicably shifted with no word being given to the general manager to that effect.

## Lack of Personal Knowledge by Affiant

The appellants mount a general and somewhat unfocused attack upon the fact that Anne Arundel County Detective Gary L. Barr was the affiant-applicant for the warrant now under review, even though Detective Barr had no direct, personal knowledge as to the probable cause in issue and had not been the primary investigator of the criminal activity being hunted down. Those observations are, of course, true, but they have no pivotal significance. The criminal activity under investigation was centered largely in Baltimore City, and the key investigator in the case was Baltimore City Detective Eric Husok. That investigation, however, led to the home of the appellant Shoemaker in Anne Arundel County as one of the places to be searched for documentary evidence of the Baltimore City crimes. Detective Husok, lacking authority to execute a search warrant in Anne Arundel County, turned to his Anne Arundel County colleague, Detective Barr. This is as it should be.

As the warrant-issuing judge in Anne Arundel County looked to the data presented to him, the following analysis was appropriate. His primary source was Detective Barr. From the fact that Detective Barr was known to him by

name, was a member of the police department, appeared before him in person and took the oath, the judge was entitled to believe Detective Barr. In probing further for the basis of Detective Barr's knowledge, the judge would have concluded that Detective Barr had no direct, personal knowledge but was a conduit passing on data from a more remote, secondary source.

That secondary source was Baltimore City Detective Husok. The *Aguilarean* two-pronged analysis would then begin again with respect to the secondary source. That secondary source was worthy of belief because he was named, was a member of a fellow law enforcement agency and was himself under oath when he made the affidavit, the copy of which was supplied through Detective Barr. So much for the veracity of the secondary source. In probing then the basis of knowledge of that secondary source, a few fragmentary observations, such as personal participation in the 1978 arrest of Charles Elmore for prostitution and personal participation in two 1978 prostitution arrests at the Geisha House in Baltimore, were direct personal observations made by Detective Husok. With respect to the great bulk of the data contained in the warrant application, however, the secondary source, Detective Husok, was in turn a conduit for information coming in from a variety of tertiary sources:

(1) William Larsen;

(2) Russell Eugene Frye;

(3) The clerk who furnished Charles Elmore's criminal record (although the records might arguably, on the subject of probable cause, speak for themselves);

(4) The clerk who furnished the data from the Department of Motor Vehicles (although the records might arguably, on the subject of probable cause, speak for themselves);

(5) The clerk who furnished the corporate records and charters of the various corporations under investigation (although the records might argu-

ably, on the subject of probable cause, speak for themselves);

(6) The various Baltimore City police officers (or the custodian of their records) who made prostitution arrests at the clubs here under investigation throughout 1978 and 1979;

(7) The Anne Arundel County officers (or the custodian of their records) who also made some of the prostitution arrests; and

(8) The Baltimore County officers (or the custodian of their records) who made several of the 1979 prostitution arrests.

As the *Aguilarean* two-pronged analysis is applied to each of these tertiary sources, it is clear that we have now moved beyond the intermediary conduits and reached the on-the-spot observers who saw the reported phenomena with their own eyes and heard them with their own ears. Their "basis of knowledge" is thus clearly established. With respect to the veracity of these various tertiary sources, their status as governmental clerks and fellow law enforcement officers, the absence of any motive to fabricate and their clear inclusion within the ranks of the. nonsuspect "citizen-informer" class, establish their veracity. On this score, *United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), was most emphatic:

> "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."

With respect to William Larsen and Russell Eugene Frye, our foregoing discussion recounting how they are named, how they gave declarations against penal interest and how their stories are buttressed by "independent police verification" needs no further reiteration in terms of establishing their believability.

The general proposition that the affiant need not be the primary source of the damning information was recognized by the Court of Appeals as early as *Dean v. State,* 205 Md. 274, 284, 107 A.2d 88:

"The facts set forth as the basis for the issuance of the warrant need not be within the personal knowledge of the applicant, but may be verified by his oath based on information and belief, if the facts and sources of his information upon which his belief is based are stated."

In applying this general principle to even more remote tertiary sources, this Court detailed the required analysis in *Dawson v. State, supra,* 11 Md.App. 701-702 n. 3:

"If the informant himself is offering not direct observation but hearsay twice compounded, the entire evaluation process must begin again at a second level of remoteness. The primary informant must then pass along sufficient data in sufficient detail so that the magistrate may again judge for himself 1) the credibility of the secondary informant and 2) the worth of that secondary informant's information. If, in some extreme hypothetical situation, the secondary informant should be a mere conduit for hearsay thrice compounded from a tertiary informant, the evaluation process is escalated to yet another level of remoteness and so on ad infinitum. *Spinelli,* at 416 (majority opinion by Harlan, J.) and 423-425 (concurring opinion by White, J.). Ultimately, the magistrate must have the benefit of someone's first-hand observation in order to evaluate the worth of the information and must have also satisfactory proof of the credibility of every person involved in the chain of transmission of the information from the initial observer to the magistrate himself."

## The Notion of a General Warrant

The appellants now claim that the warrant to search the Shoemaker home was the dread general warrant condemned by the Founding Fathers. So expansive a rhetoric runs afoul of the more modest approach we recommended in *Hignut v. State,* 17 Md.App. 399, 417, 303 A.2d 173:

> "The 'general warrant' was a roving commission to police agents, in seeking out certain types of crime, to search anyone or any place, at any time, anywhere. The niggling complaint at bar is antipodal to the broad issue over which we fought a Revolution. Magna Charta need not be invoked everytime a policeman dots the wrong 'i'."

In the case at bar, moreover, the policeman dotted the right "i."

The appellants complain that all of the allegations dealing with the Shoemaker home pointed to the suspect documents being in a single desk in a single room and that the warrant gave the officers the unnecessarily broad prerogative to search the entire house. The appellants misread the particularity clause and its history. In limiting the scope of even legitimate searches, the warrant shall particularly describe the "things to be seized." In this case, that was done, as the warrant directed the police to search for and to seize "certain books, ledgers, monies, checks, personal and business directories, applications, membership rosters and other business records which are evidence pertaining to the operation of an illegal prostitution operation."

The appropriate scope limitations of the Fourth Amendment also prescribe that the warrant shall be one "particularly describing the place to be searched." This provision, however, has always been recognized as one which seeks to condemn the roving commission of the "general warrant" or "writ of assistance" to search houses and other places indiscriminately in the unfettered discretion of the search officer. Its salutary purpose is to narrow the locus of the search to

a particular, ascertainable, well-described house. In *Harris and Schmitt v. State,* 17 Md.App. 484, 487, 302 A.2d 655, Judge Scanlan for this Court traced the history of this particularity requirement and concluded that its "spirit and thrust" are codified in Art. 27, Sec. 551 of the Code, which provides that a "search warrant shall name or describe, with reasonable particularity the . . . building, apartment, premises [or] place . . . to be searched. . . ." That was done with great particularity in the case at bar, as the warrant application described the place to be searched as:

> "742 Bridge Drive, Pasadena, Anne Arundel County, Maryland 21122. The house being described is a red brick rancher with an open carport which lies approximately 200 feet east from the intersection of Bridge Drive and Magothy Beach Road.
> There is white trim around the windows and black shutters on the front of the house. An aluminum storm door on the front."

What we have in this case is not what the Founding Fathers condemned but what the Founding Fathers were hoping to achieve.

### The Scope of the Search as Executed

The final Fourth Amendment complaint deals not with the generality of the search as authorized but rather with the generality of the search as executed. The appellants claim that in addition to seizing the evidence of crime properly and particularly described in the warrant, the searching party also seized a number of other, innocuous objects such as receipts for repairs to various structures, warranties for household appliances, oil company credit cards, a prescription for eyeglasses, a Social Security card, a Blue Cross/Blue Shield card, and an engraved picture of a racehorse. They urge, with no direct authority to support them, that this calls for the suppression of even the properly seized evidence. Our answer once again lies in *Andresen v.*

*State,* 24 Md.App. 128, 180, 331 A.2d 78, *cert. denied,* 274 Md. 725, *aff'd,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), which dealt with a remarkably similar set of facts and an almost identical claim:

> ". . . even if other items had been unconstitutionally seized, that frailty would not mandate the suppression of the items which were constitutionally seized. If the apples remaining in the barrel when it ultimately comes to rest upon the trial table are constitutionally healthy, it matters not how many constitutionally rotten ones were discarded along the way."

See also *Spease and Ross v. State,* 21 Md.App. 269, 282-283, 319 A.2d 560, and cases cited therein.

## The Other Two Contentions

Above and beyond the Fourth Amendment issues, the appellants also claim reversible error in that:

(6) The evidence was not legally sufficient to sustain the convictions; and

(7) The court committed plain error in instructing the jury as to its role as the judge of the law.

With respect to the sufficiency of the evidence, it suffices to say that we have read the record thoroughly and are fully persuaded that the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which the jury could fairly be convinced beyond a reasonable doubt, of the guilt of the appellants for the offenses charged. It was, therefore, proper, for Judge Ward to submit the case to the jury for its appraisal. *Williams v. State,* 5 Md.App. 450, 459, 247 A.2d 731; *Metz v. State,* 9 Md.App. 15, 23, 262 A.2d 331.

The appellants' final contention is that the instruction to the jury on its role as judge of the law was improper under *Stevenson v. State,* 289 Md. 167, 423 A.2d 558. The short answer to the contention is that no objection was made and

nothing is preserved for appellate review. Md. Rule 757f, h. The appellants ask that we overlook this dereliction on their part and notice "plain error" in our discretion in the interests of justice. The interests of justice dictate that we not notice it, for the instruction, right or wrong, did not have the remotest thing to do with the outcome of this case. Competing interpretations of law were not in any way involved; the State's Attorney made no argument in such regard; the defense attorney made no argument in such regard. The ancient but outmoded boilerplate instruction, droned out faithfully on this occasion, was utterly immaterial to any matter the jury was even tangentially called upon to consider.[2]

> *Judgments affirmed; costs to be paid by appellants.*

---

[2]. As to what moves us to exercise discretion, see generally Williams v. State, 34 Md.App. 206, 210-216, 366 A.2d 399.