Rockingham
No. 86-073

THE STATE OF NEW HAMPSHIRE

v.

BENJAMIN VALENZUELA & a.

December 31, 1987

*Stephen E. Merrill*, attorney general (*Brian T. Tucker*, associate attorney general, and *Steven L. Winer*, assistant attorney general, on the brief, and *Mr. Tucker* orally), for the State.

*Shaheen, Cappiello, Stein & Gordon*, of Concord (*Katharine L. Klein* and *Stephen M. Gordon* on the brief, and *Mr. Gordon* orally), for the defendant Benjamin Valenzuela.

*Cullen & Wall*, of Boston, Massachusetts (*Albert F. Cullen, Jr.*, and *Robert V. Carr* on the brief, for Young, and *John Wall* on the brief, for DiMatteo, and *Mr. Cullen* orally), for the defendants Antimo DiMatteo and Stephen D. Young.

SOUTER, J.   These consolidated appeals follow convictions of the three defendants on a total of seventeen charges under the controlled drug act, RSA chapter 318-B, including possession of large quantities of cocaine with intent to sell. The defendants claim that the Superior Court (*Wyman*, J.) erred in authorizing the interception of the contents of communications transmitted over defendant Stephen Young's telephone lines on the basis, in part, of information obtained by the use of pen registers, previously installed on the same lines under a federal court's order unsupported by probable cause; that *Gray*, J., committed error in refusing to conduct a hearing under *State v. Spero*, 117 N.H. 199, 371 A.2d 1155 (1977) in response to the defendants' claim that the superior court's interception order rested on false statements knowingly or recklessly made, and in failing to suppress the evidentiary fruits of the interception as illegally obtained; and that *Gray*, J., erred further in denying motions to suppress evidence seized under warrants to search the defendants' houses, after rejecting the defendants' claim that the issuing magistrate was not neutral and detached, and after likewise rejecting the claim that the police exceeded the scope of their authority to enter Young's house, by executing the warrant in the nighttime, and by seizing

so much material as to convert the enterprise into an unlawful general search. We affirm.

In 1983, during the course of an investigation into the illegal sale and distribution of controlled drugs, the New Hampshire State Police obtained an unlisted telephone number assigned to the defendant Young, toll call records for his two telephones, and an authorization to install a pen register on each of his two telephone lines. A pen register is a mechanical device to detect outgoing signals produced on a telephone line when a number is dialed. It decodes the signals, prints the number, records the date and time, and indicates whether the call is answered. *See* RSA 570-A:1, XII (Supp. 1986). The pen register model used by the State police can also be used to record the presence of an incoming call signal and to indicate whether the receiving telephone was removed from the hook in response, and by the addition of supplementary mechanisms the police could intercept and record the content of an oral communication over the line. There is, however, no indication in this case that the police used the device to detect incoming signals, or to intercept the content of any communication over Young's lines to or from any other telephone.

Prior to January 1, 1987, the effective date of RSA 570-A:9-a (Supp. 1986), the New Hampshire wiretapping statute contained no express reference to pen registers as such. Although the State police assumed that the superior court's authority to order the interception of communications over a telephone line under RSA chapter 570-A was broad enough to authorize the installation of a pen register, the statute did not appear to include the operation of a pen register within the scope of "intercept," for which the statute required judicial authorization. *See* RSA 570-A:1, III and :7. Given this uncertainty, the police did not wish to follow the State statutory process, because RSA 570-A:9, V would have limited any authorization to a period of ten days, subject to renewals for like periods. Since the police wished to monitor calls on Young's two lines for a longer period, they asked federal agents to act on their behalf in obtaining pen register authorizations from the United States District Court for the District of New Hampshire under Federal Rule of Criminal Procedure 57(b) and the All Writs Act, 28 U.S.C. § 1651(a). The federal court authorized the installation of the pen registers for thirty days, and later renewed the order, upon finding that the application was made in good faith for the purpose of furthering a pending investigation, and with reason to believe that the telephone lines in question were and would be used to further criminal activity. The court directed the telephone company to

permit and facilitate the installation, with the right to be compensated for any expense it might incur in doing so.

On January 5, 1984, Sergeant Henry Carpenito of the State police prepared an affidavit that combined data provided by the pen registers about calls made from Young's telephones, records of toll calls made from those same telephones and from telephones assigned to the defendants Benjamin Valenzuela and Antimo DiMatteo, and information about the three defendants obtained from police records, investigators, and informers. On this basis he obtained a superior court wiretap order under RSA 570-A:9 for an interception of the contents of communications during completed calls over the same telephone lines assigned to Young that the pen registers had previously monitored for numbers dialed in outgoing calls. These interceptions provided information on the basis of which the police, in turn, obtained warrants on January 15, 1984, to search the houses of all three defendants. The ensuing searches yielded, *inter alia,* 65 pounds of cocaine, nearly a ton of marijuana, LSD tablets, jewels, over $200,000 in cash, ledgers and other documentary evidence of drug traffic, and an assortment of pistols, revolvers, and ammunition.

After unsuccessfully litigating motions to suppress the State's evidence, the defendants waived jury trial and submitted their cases to the superior court on the basis of the existing records and certain stipulations. The Trial Court (*Gray,* J.) returned guilty verdicts on the seventeen charges and proceeded to sentence Valenzuela and DiMatteo to prison terms of 15 to 40 years, and Young to a term of 25 to 70 years. These appeals followed.

As our statement of facts indicates, the accumulation of evidence upon which the search warrants ultimately rested began with the acquisition of Young's one unlisted number, followed by the disclosures of toll records for his telephones (as well as for the telephones assigned to DiMatteo and Valenzuela), and the production by the pen registers of lists of numbers called on each of Young's lines. The defendants maintain that the State acquired all of this information in violation of part I, article 19 of the Constitution of New Hampshire. In this appeal, however, the defendants address their specific arguments solely to the acquisition of telephone numbers by use of the pen registers, apparently on the assumption that all of their claims will stand or fall together. We will limit our decision accordingly, to the constitutional significance of using a pen register to record and disclose numbers dialed to make outgoing calls from a defendant's telephone. (In view of our conclusion about the requirements of article 19 on the theory

of the case as it has been presented to us, there is no need to reach the State's objection that Valenzuela and DiMatteo lack standing even to object to the use of the pen register evidence, and on like reasoning there is no call to consider any issue about the propriety of the State police's reliance on federal process for authorization to install the devices.)

Article 19 prohibits unreasonable searches and seizures of an individual's "person, his houses, his papers, and all his possessions." The defendants argue the State was thereby barred from access to evidentiary information about numbers dialed on Young's telephones without first obtaining a warrant or comparable process, supported by a showing of probable cause to believe that the information sought would include evidence of a crime. Because the State made no such demonstration, the defendants submit that the information and all subsequent evidence obtained through its use should be suppressed.

The State concedes that the orders authorizing installation of the pen registers did not rest on any findings by the federal judge that probable cause existed to believe that the telephone lines would be used to make outgoing calls for criminal purposes or that such purposes would be revealed by examination of numbers called on the lines. The State takes the position that it had no obligation to demonstrate such probable cause, because the use of a pen register to record the number dialed to make an outgoing call on the line to which the register is attached is not a search of the person or property of the subscriber to whom the line is assigned, so as to be subject to the restrictions imposed by article 19. (That, we infer, is also the assumption underlying the recently enacted statute regulating the use of pen registers, RSA 570-A:9-a (Supp. 1986), which imposes no probable cause requirement. *See id.*, subparagraph III.)

Ironically, the parties purport to rest their differing conclusions on a common assumption, that the scope of article 19 protection should be judged by reference to the concept of privacy adopted by the Supreme Court of the United States in *Katz v. United States*, 389 U.S. 347 (1967), as a criterion for determining the extent of fourth amendment protection. Despite the parties' agreement, however, this common ground has no support in our prior case law. *See State v. Kilgus*, 128 N.H. 577, 591, 519 A.2d 231, 240 (1986) (decided on the assumption "arguendo" that article 19 applies to electronic eavesdropping, on analogy with the fourth amendment rationale developed in *Katz*). Indeed, so far as we are aware, this court has never been asked to construe article 19 by choosing from

among the possibilities ranging from the holding of the *Katz* majority, see *Katz v. United States, supra* at 353, through other generalized principles of privacy, to the position taken by Justice Black, who dissented in *Katz, see id.* at 364. Nor do the parties address these interpretive alternatives here, where neither side has briefed the background of article 19 and the history of its application as bearing on the extent to which *Katz* may be a sound guide to our own constitution. Although we might, therefore, set the case down for reargument addressed to the fundamental issue, we have decided against doing so because we are satisfied that even under *Katz* the defendants are entitled to no relief. We are thus able to rule on the defendants' claim in the posture in which the parties have presented it, and we leave it for another day to decide whether the view of the *Katz* majority should be taken to reflect a theory inherent in article 19. (In so confining our decision, we do not, of course, cast any doubt upon the vitality of prior cases recognizing civil rights of action for violations of privacy interests. *See Sawyer v. Boufford,* 113 N.H. 627, 630, 312 A.2d 693, 695 (1973); *Hamberger v. Eastman,* 106 N.H. 107, 206 A.2d 239 (1964).)

On the *Katz* analysis, protection against unreasonable searches and seizures is not limited by references to private physical premises, or to persons or to tangible evidence. While the fourth amendment, like article 19, speaks in terms of security against unreasonable searches and seizures of a person, his houses, papers, and effects (or possessions), *Katz* held that the intangible contents of a defendant's statement may be subject to fourth amendment protection from discovery, without reference to physical invasions of constitutionally protected areas. *Katz,* 389 U.S. at 353 (citing *Silverman v. United States,* 365 U.S. 505, 511 (1961)). "[T]he Fourth Amendment protects people, not places," *id.* at 351, and even without a traditional physical intrusion upon a defendant or his property, the government's effort to obtain information communicated by him may be a "search" subject to constitutional regulation. Two generally applicable criteria must be satisfied, however: the defendant objecting to the use of such evidence must have entertained a subjective expectation that the evidence would remain private, and his expectation must have been one that society is prepared to honor as reasonable or legitimate. *Id.* at 361 (Harlan, J., concurring).

*Katz* did not, of course, hold that its theory of privacy circumscribed the extent of protection against unreasonable searches and seizures. *Id.* at 350. But when the government's effort to obtain evidence does not take the form of a physical search of or for a

defendant's person, house, papers, or property, an understanding of the *Katz* privacy concept is necessary to determine whether the effort is a search subject to constitutional review.

Such an understanding is not easily gained, however. *Katz* held that a person making a telephone call may reasonably expect privacy as against the government's warrantless use of an electronic eavesdropping device to overhear the statements he utters within a public telephone booth. *Katz, supra* at 353. Although this holding might have invited broad conceptualization, the *Katz* majority were plain to say that they had no intention of engrafting a general theory of privacy protection onto the trunk of the fourth amendment. *See Katz, supra* at 350.

*Katz* does not leave its readers without further guidance, however, since the majority opinion did describe one means of the government's access to evidentiary information that would not violate any legitimate expectation of privacy, and would not, therefore, involve a regulated "search." The majority opinion approvingly cited *Lewis v. United States*, 385 U.S. 206, 210 (1966), *reh'g denied*, 386 U.S. 389 (1967), for the proposition that the fourth amendment recognizes no claims of privacy in what a person "knowingly exposes to the public, even in his own home or office." *Katz*, 389 U.S. at 351.

The citation to *Lewis* thus defines constitutionally protected privacy, at least in the negative sense of limiting its scope, and it must therefore be seen as integral to the *Katz* decision and to an understanding of what *Katz* does and does not recognize under the rubric of protected privacy. In *Lewis*, the court rejected a claim that the fourth amendment bars admission of tangible evidence and information revealed by a defendant in his own house to a witness who had deceptively concealed his role as a government agent. *Lewis, supra* at 210–11. *Lewis* was decided on the same day as *Hoffa v. United States*, 385 U.S. 293 (1966), *reh'g denied*, 386 U.S. 940 and 951 (1967), which held that the fourth amendment is no barrier to the testimony of an informer in whom the defendant had misplaced his trust, *id.* at 302, and both *Lewis* and *Hoffa* may be grouped with *Lopez v. United States*, 373 U.S. 427, 437–38 (1963), which held that a secretly recorded tape of a defendant's statements to an Internal Revenue agent was admissible under the fourth amendment.

The significance of these cases for an understanding of constitutionally protected privacy has not waned in the years since *Katz* was decided. They were affirmed as undisturbed by *Katz* in *United States v. White*, 401 U.S. 745, 752 (1971), which held that the

contents of a conversation between the defendant and a government agent were admissible through the testimony of a witness who had heard the conversation broadcast by a transmitter concealed on the agent's person. The Supreme Court subsequently described *White*'s rationale as "well-settled," *United States v. Jacobsen*, 466 U.S. 109, 117 (1984), and we ourselves have called *White*'s logic "inescapable," when considering the scope of protection within the conceptual framework of *Katz*, *State v. Kilgus*, 128 N.H. at 591, 519 A.2d at 241.

This understanding of the agent-informer cases illuminates the State's position that the uses of the pen registers in the instant case did not infringe any protected privacy under *Katz* and therefore should not be treated as constitutionally regulated searches. The pen registers, installed on the telephone company's lines, received coded signals sent from Young's telephones to the company for the purpose of enabling it to connect Young's telephones with those he sought to call. In making a record of the decoded signals, the registers did no more than record voluntary communications from the defendant to the telephone company. (Such communications to the company are to be distinguished from the contents of communications transmitted over the company's lines and addressed not to the company but to the recipients of completed calls. The latter, of course, would be subject to protection under *Katz* and under RSA chapter 570-A.) It is obvious, and is indeed undisputed, that no constitutionally protected privacy would have been infringed, and no search conducted, if the telephone company had informed the government of numbers orally communicated by Young to an operator. The company and its operator would have been doing nothing different from what the agent or informer might do, and *Katz* would erect no constitutional hurdle to the government's evidentiary use of what the company or the operator disclosed. The same conclusion should follow by analogy when a pen register installed on the company's wire informs the government of the decoded messages communicated to the company through the use of the company's dialing and switching equipment. The only distinction between the two cases is the use of mechanical rather than human receptors of the message intended to inform the company of the caller's desired connection, and such a distinction should make no difference for constitutional purposes.

It is of course ordinarily true today, as it is in this case, that the company becomes an informer only in response to a court order requiring installation of the pen register on one of its lines. But this fact does not affect the soundness of the analogy, since the

holdings of the agent-informer cases do not require the agent-informer either to initiate his relationship with the government or to act with selfless disinterest. An informer, for example, may reveal information to the police out of a sense of civic obligation, or he may do so to obtain money or prosecutorial favor. *See United States v. Hoffa, supra* at 299. A paid agent may testify to something he learns quite by chance or to information he was directed to obtain as a condition of earning his government salary. What is crucial in these cases is the defendant's voluntary disclosure of evidence to the agent-informer, not the agent-informer's interest or motivation when he informs the government. On like reasoning it should not matter whether the telephone company accedes to a pen register order because it does not care one way or the other whether such registers are used, or because it believes that cooperation with law enforcement is in the long-term interest of a regulated utility. Suffice it to say that neither the authorities cited nor the facts of this case involve an agent or informer who claims to have been unaware that he was providing information to a third party, or who maintains any objection to disclosing it, or who claims that his will was impermissibly overborne in coercing him to make the disclosure.

The Supreme Court accepted this logic in *Smith v. Maryland*, 442 U.S. 735 (1979), where it recognized the analogy between the oral instruction given to the operator who repeats it, and the electronic instruction given to the switching equipment over a line to which a pen register is attached. *Id.* at 744. The Supreme Court followed *Katz* in citing agent-informer cases to support its holding, that when the telephone company accedes to the government's request to provide a pen register's record of numbers dialed on a defendant's telephone, the defendant has no sustainable claim to a reasonable expectation of privacy in the coded information that he has voluntarily supplied to the company for the purpose of activating its switching mechanisms. *Id.* at 743–45. The Court thus rested the decision on the principle, "consistently . . . held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743–44.

The defendants have been quick to point out, however, that *Smith* has not escaped controversy. While some State constitutional analyses have reached the same result, *see, e.g., People v. Guerra*, 65 N.Y.2d 60, 63–64, 489 N.Y.S.2d 718, 720, 478 N.E.2d 1319, 1321 (1985); *Yarbrough v. State*, 473 So. 2d 766, 767 (Fla. App. Dist. 1985); *State, ex rel. Ohio Bell v. Williams*, 63 Ohio St. 2d 51, 53, 407 N.E.2d 2, 3–4 (1980), the defendants call our attention to

jurisdictions that have gone the other way, *see, e.g., State v. Gunwall,* 106 Wash. 2d 54, 720 P.2d 808, 813 (1986); *Commonwealth v. Beauford,* 475 A.2d 783, 789 (Pa. Super. 1984), *appeal dismissed,* 496 A.2d 1143 (Pa. 1985); *People v. Sporleder,* 666 P.2d 135, 139–40 (Colo. 1983); *People v. Blair,* 25 Cal. 3d 640, 654, 159 Cal. Rptr. 818, 827, 602 P.2d 738, 746–47 (1979), and to commentary critical of the *Smith* opinion, *see, e.g.,* 1 LaFAVE, SEARCH AND SEIZURE § 2.7 (Supp. 1986); Comment, "Pen Registers After *Smith v. Maryland,*" 15 HARV. C.R.–C.L. L. REV. 753 (1980).

The defendants have proceeded to marshal some of the principal criticisms of *Smith* expressed in the authorities cited, to which we will respond by indicating why we believe that the State's position, and *Smith*'s result, are sound in the light of *Katz.* At the outset, however, it is well to mention two respects in which we decline to rest our own application of *Katz* on the discussion contained in *Smith.* First, the *Smith* opinion spent some time considering the defendant's subjective expectation of privacy in the dialed numbers, concluding that he probably entertained no such expectation because he presumably knew that the company sometimes recorded numbers dialed, in order to bill for toll calls and commercial service, and to trace obscene communications. *Smith, supra* at 742. Whatever may be the merits of this ostensibly factual conclusion, it is in the last analysis unnecessary if the Court was also correct, as we believe it was, in holding that any such expectation of privacy would have been unreasonable in the light of *Katz.* We will not, therefore, address the defendants' arguments that Young did in fact expect to preserve the privacy of his activity in dialing numbers. We will, indeed, assume with Justice Batchelder, who dissents from this opinion, that Young entertained just such an expectation. *See United States v. Jacobsen,* 466 U.S. at 122–23.

Second, the *Smith* Court referred to the defendant's assumption of the risk that the information dialed would be passed on to the government. *Smith,* 442 U.S. at 744–45. Although that reference reflected nothing more than the antecedent law on the admissibility of information given to agents or informers, *see id.* at 743–44, it was a reference that risked an appearance of circular reasoning and occasioned Justice Marshall's criticism, in dissent, that a telephone subscriber does not voluntarily assume a risk from using the telephone when he has no practical alternative to using it. *Id.* at 750 (Marshall, J., dissenting). We will, therefore, avoid the assumption-of-risk terminology, and its tendency to obscure the reasons for the result we reach.

With these disclaimers made, we turn to the defendants' principal criticisms of *Smith* and objections to the State's position. The first focuses on the notion of the governmental activity to be regulated, when the defendants argue that any governmental effort to obtain evidence should be treated as a search within the meaning of the constitution and should therefore be subject to limitation under a standard of reasonableness requiring justification in demonstrated probable cause. The second focuses on the acts of a defendant that may limit opportunities to claim constitutional protection, when the defendants argue that a waiver of privacy by disclosure to a third party should not be equated with a waiver as against the government.

The first of these points is easily restated: there should be no category distinction between a governmental effort to obtain evidence and a search for purposes of constitutional protection. The government is seeking evidence whether it examines the contents of a desk, listens to an intercepted wire communication, or installs a pen register on telephone company equipment to obtain the numbers that a defendant dials on his telephone. So efficient, indeed, is this last mechanism, and so general and comprehensive is its searching capability, that the defendants discern an especially insistent call for constitutional scrutiny.

The response to this argument may be stated just as readily, however. To maintain the position that any effort to gather evidence should be treated as a search regulated in law is, ultimately, to reject the reasoning of the agent-informer cases. This is apparent in Justice Marshall's dissent in *Smith*, which begins with citations to his earlier dissents in cases like *United States v. White*, 401 U.S. 745. The defendants evidently recognize this, too, when they try to characterize the precedential force of those cases as "tenuous" and suggest that accepting the defendants' own position would be an easy step to take.

Accepting their position would, on the contrary, be a constitutional volte-face. The implication of a rule requiring warrants for pen registers installed on company equipment to record the numbers that a defendant dials would also require a warrant before the government could utilize evidence that might be communicated to an agent or even to an informer, except to the extent that the latter might volunteer information spontaneously. Such a requirement would curtail, if not effectively eliminate, the use of agents, which has been described as an "essential" law enforcement practice, *Sorrells v. United States*, 287 U.S. 435, 441–42 (1932), and which less than a year ago we held to be outside the scope of activity

subject to the warrant requirement on the assumption, *arguendo*, that article 19 incorporated *Katz, State v. Kilgus*, 128 N.H. at 591–92, 519 A.2d at 240–41. Not only is there no justification for re-examining our position so soon after *Kilgus*; it is simply too late in the day to raise doubts under article 19 or the fourth amendment about the constitutionality of using evidence obtained without a warrant through a government agent or informer to whom a defendant has voluntarily disclosed or transferred it. *See Power Comm'n v. Pipeline Co.*, 315 U.S. 575, 582 (1942) (regulations recognized too long as proper under the fourteenth amendment to doubt propriety of like regulations under the fifth amendment).

The revolutionary implication of the defendants' position is not limited, however, to its call to deny the persuasive authority of federal cases from *Lopez* to *White*, or to overrule our own decision in *Kilgus*. For if we followed the defendants' lead, we would have to redefine the very concept of privacy established by *Katz*, upon which the defendants claim to rely. The defendants fail to face the fact that the privacy held reasonably expectable under *Katz* is not an immunity to the use of evidence that a defendant has disclosed to an agent or informer who is willing to reveal it. If the defendants will have us apply *Katz*, they will have to take *Lopez, Lewis, Hoffa, White*, and *Kilgus* along with it. They cannot have it both ways. *Katz* is no support for the defendants' position, and *Kilgus* already bars their argument.

The defendants' second objection to the State's position starts from the undoubted fact that a telephone subscriber who willingly provides the telephone company with information, consisting of a number dialed, does not thereby intend to provide that information to the government. Other critics of *Smith* have stressed this same fact, *see, e.g., Smith v. Maryland*, 442 U.S. at 749 (Marshall, J., dissenting); "Pen Registers After *Smith v. Maryland*," 15 HARV. C.R.-C.L. L. REV. at 755, and it is one of Justice Batchelder's principal concerns in his dissent today. The fact is said to support the view that there are "degrees of privacy," *id.*, so that waiver to some degree is not waiver of all privacy protection, even against the government.

Once again, however, the defendants' view is at odds with *Katz*. The claim that there are degrees of privacy and that the result in *Smith v. Maryland* fails to account for them rests on a conception of privacy that is different from the conception of constitutional privacy that *Katz* recognized. At one level, the degrees-of-privacy critique describes a subjective intent or expectation: the subscriber who dials does not mean to provide information to the government.

This subjective posture, however, has no dispositive significance under *Katz*; a subjective expectation of privacy is necessary, but it does not alone suffice to create a pale of privacy, within which any intrusion by the government is a constitutionally regulated search. Standing alone, the recognition that there are subjectively recognized degrees of privacy is inadequate either to ground a conclusion under *Katz*, or to prove that *Smith* was wrongly decided when it adopted the position for which the State argues today. *See United States v. Jacobsen*, 466 U.S. at 122–23.

Even if we attempt to elevate expectations of degrees of privacy above the purely subjective level, however, *Katz* still stands in the defendants' way. We cannot simultaneously recognize the defendants' asserted limitations on waivers of privacy as against the government and continue to adhere to the rationale of the agent-informer cases, for if a defendant should be entitled to limit his waiver of privacy as against the use of the pen register's report of what he dialed to the company, he should be able to limit any waiver as against the government's testimony of what he said to the agent. Since *Katz* accepted the agent-informer cases, the defendants can not assert a constitutional theory of limited waiver without partially repudiating *Katz*, upon which they claim to rely. The defendants' position would redefine *Katz*'s privacy by converting it from a defendant's right to be secure against certain means of non-consensual access to his communications and possessions, into a defendant's right to control the use of evidence without regard to how the defendant may have disclosed that evidence to another. It would empower a defendant to enforce a kind of evidentiary copyright, by precluding the government's use of information for a purpose that the defendant did not intend when he communicated with another. Suffice it to say that we could not accept the defendants' position without a wholesale overruling of the agent-informer cases including *Kilgus*, which stand together as an integral limit to *Katz*'s concept of privacy.

■ In summary, we reject the defendants' arguments, both because they would entail our repudiation of the agent-informer cases, and because they are inconsistent with the holding of *Katz*, to which the agent-informer cases are an express and essential limitation. Under *Katz* and the agent-informer cases, there is no violation of constitutional privacy when the telephone operator acts as a government informer by communicating what a defendant has addressed to the operator, and we therefore find no violation when the "hearer" is not an operator, but a machine receiving functionally equivalent information communicated by a defendant and

directed to the company. In each case the government obtains from the company's chosen means of operating its system the information that the defendant-customer has communicated to the system in order to make it work for him. Since there is no violation of a protected privacy interest when the operator repeats what the customer has told him, neither is there one when the record of the pen register is disclosed.

Because we therefore conclude that the *Katz* conception of protected privacy, if applied through article 19, would not limit the use of a pen register to obtain the numbers that a defendant dials on his telephone, it is not significant that the federal order authorizing the installation of the devices in issue here was unsupported by probable cause. Accordingly, the defendants have supplied no reason to argue that the superior court should have rejected the information provided by the registers when it determined whether the State had established the probable cause required by RSA 570-A:9, III for the subsequent order authorizing the interception of communications over Young's two telephone lines.

The defendants argue that the fruits of the interceptions were subject to suppression nevertheless, because of various intentional or reckless misrepresentations allegedly made by Sergeant Carpenito in the affidavit he submitted to the superior court with the application for the interception order. When the defendants raised this issue prior to trial, the superior court first determined that the alleged misrepresentations, taken together, were not material, in the sense of being necessary for a finding of probable cause. Having so determined, the court refused to hold a hearing to receive evidence of the intentional or reckless falsity claimed, and denied any relief predicated on misrepresentation.

The defendants concede that the superior court's action is consistent with the federal standard for dealing with alleged misrepresentations in warrant applications, as established by *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, a defendant is not entitled to a hearing on a claim that a facially sufficient warrant application rests on intentional or reckless misrepresentations by the police, unless excision of the disputed statements would eliminate the probable cause for the issuance of the warrant. *Id.* at 171–72. The defendants do not claim that excision of the misrepresentations alleged in this case would have eliminated probable cause for issuance of the interception order.

They argue, however, that *State v. Spero*, 117 N.H. 199, 371 A.2d 1155 (1977), and a line of cases following it, establish more lenient standards of entitlement under State law, both to an evidentiary hearing and to relief, upon such a misrepresentation claim. In the defendants' brief, they put their understanding of *Spero* and the succeeding cases this way:

> "[W]hen a defendant makes a preliminary showing that an affidavit in support of a warrant contains misstatements which contribute to the finding of probable cause, the defendant is entitled to a hearing to determine whether the affiant made such misrepresentations intentionally or recklessly; if so, the warrant must be quashed and any evidence derived from its execution must be suppressed."

This statement is wrong in two significant respects.

First, it erroneously assumes that under State law a defendant is entitled to be heard in challenging a facially valid warrant if he makes a preliminary showing that misstatements by the police merely "contributed" to the demonstration of probable cause. On the contrary, the defendant is not entitled to a hearing unless the statements subject to the preliminary showing of falsity were material, to the degree that there would have been no demonstration of probable cause without them. *See State v. Grimshaw*, 128 N.H. 431, 436, 515 A.2d 1201, 1204 (1986) ("In light of the fact that the information provided by the confidential informant was unnecessary to the finding of probable cause, we need not reach the defendant's contention that the [police] affiant fabricated the existence of that informant . . . ."); *State v. Spero*, *supra* at 204, 205, 371 A.2d at 1158, 1159 ("The misrepresentations in the affidavit . . . were clearly material. . . . If the affidavit had been in accordance with the facts . . . it would not have sustained a finding of probable cause"); *see also Franks*, 438 U.S. at 171–72 (no hearing unless excision of allegations subject to preliminary showing of falsity would eliminate probable cause); Kipperman, *Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence*, 84 HARV. L. REV. 825, 829 n.35 (1971) (to be material, disputed allegation must be necessary to establish probable cause).

This first substantial error in the defendant's quoted statement leads to the second, the assumption that a defendant would be entitled to relief by suppression of evidence upon demonstrating that any false statement contributing to probable cause was made knowingly or with reckless disregard for its truth

or falsity. This, of course, would be entirely inconsistent with the requirement of materiality discussed above. We would not deny a hearing on the ground that the disputed statements were immaterial as being unnecessary to demonstrate probable cause, if the police's knowing and reckless falsity in making any statement of any significance would entitle a defendant to relief. *See State v. Chaisson*, 125 N.H. 810, 814, 486 A.2d 297, 300 (1984) (because disputed statements are not material, the court need not address claim that they were made with reckless falsity). On the contrary, however, a defendant is entitled to relief following an evidentiary hearing only if he actually demonstrates both that the police knowingly or recklessly misstated facts, and that the misstatements, taken together, were material in the sense described above, as necessary for probable cause. *State v. Spero*, 117 N.H. at 205, 371 A.2d at 1158.

In summary, the rule under article 19 is that a defendant is entitled to be heard in attacking a facially valid warrant only after a preliminary showing that in demonstrating probable cause for issuing the warrant, the police made knowing or reckless misstatements that were material in the sense of being necessary for the finding of probable cause. Thereafter, such a defendant is entitled to relief only upon demonstrating that the police in fact knowingly or recklessly made misstatements rising to that material level. In substance, then, the New Hampshire rule established by *Spero* is identical to the later federal rule announced in *Franks*, notwithstanding any suggestion to the contrary in *State v. Renfrew*, 122 N.H. 308, 444 A.2d 527 (1982); *State v. Doyle*, 126 N.H. 153, 489 A.2d 639 (1985); or *State v. Stiles*, 128 N.H. 81, 512 A.2d 1084 (1986). At this point, the only occasion for arguing that there may be a difference between the State and federal rules is the silence of our prior opinions on what is necessary for the requisite "preliminary showing" of material misstatement, beyond mere allegations. *See Franks v. Delaware*, 438 U.S. at 171–72. Since, however, this issue is not before us, we confine ourselves to holding that the trial court committed no error in refusing to hold a *Spero* hearing, absent allegations of misrepresentation rising to the requisite degree of materiality. (Although the collective materiality of the statements and omissions in question is likewise not in issue, we have examined them and agree with the trial court that they are not material.)

The defendants next attack the interception order on the ground that the information supplied by affidavit in support of the State's application was stale, and for that reason was insufficient to

demonstrate probable cause to believe that Young's use of his telephones would provide evidence about the commission of an offense specified in RSA chapter 570-A. *See* RSA 570-A:9, III. Although the defendants' brief invokes both federal and State constitutional grounds for this argument, only the State issue is raised, the motion to suppress having been grounded solely on part I, article 19 of the State Constitution. On this point, however, even the reference to the State Constitution is academic, since RSA 570-A:9, III requires probable cause for issuance of an interception order.

The defendants reveal the central weakness of their staleness claim when they state in their brief that the superior court "relied upon stale information" in reaching the probable cause determination. The quotation reflects a confusion between stale probable cause and stale information. *See State v. Andrews*, 125 N.H. 158, 165, 480 A.2d 889, 893 (1984). Stale probable cause, so called, is probable cause that would have justified a warrant at some earlier moment that has already passed by the time the warrant is sought. Speaking of the probable cause as "stale" in such a case merely reflects the requirement that "the police must show that at the time of the application for the warrant there is a substantial likelihood of finding the [evidentiary material specified]." *State v. Marcotte*, 123 N.H. 245, 248, 459 A.2d 278, 280 (1983).

There is not, however, any dispositive significance in the mere fact that some information offered to demonstrate probable cause may be called stale, in the sense that it concerns events that occurred well before the date of the application for the warrant. If such past fact contributes to an inference that probable cause exists at the time of the application, its age is no taint.

The various vintages of the facts stated in the affidavit under consideration here illustrate this point, by demonstrating how the old and the new can combine to demonstrate current probable cause. The affidavit begins with a recitation of the items in Young's criminal record: 1965, New York, a charge of first degree grand larceny, but without record of court disposition; 1967, Illinois, petty theft trespass to auto, guilty; 1969, Illinois, sale of LSD, nol prossed; 1970, Wisconsin, sale of dangerous drugs, guilty; 1973, Arizona, possession of marijuana for sale, and transportation of marijuana, dismissed; 1974, Massachusetts, possession of marijuana with intent to sell, and conspiracy to violate the Massachusetts Controlled Drug Act, guilty.

This recitation is followed by circumstantial evidence that Young's contact with the illegal drug market did not end with his 1974 conviction, for the police described an incident in 1980, when Young's wife was arrested in his presence for possession of a package containing cocaine and methaqualone. The affiant further states that in 1982 Young had been about to leave for Florida when he was found in possession of $159,880 in cash at Logan Airport. This incident followed others in 1980, when a person identified by one of the informants as a courier for Young was stopped at the airport with $50,000 in cash, and in 1982, when the wife of a Rhode Island man believed to be one of Young's customers was stopped at Logan with $104,000 in cash.

The affidavit proceeds from circumstantial to direct evidence, as it relates information supplied by two informers about Young and his activities. One of the informers described his association with Young and DiMatteo in the sale and distribution of drugs between 1979 and 1981, and the other gave information about a like association in 1981 and 1982. Each confirmed the other's story that DiMatteo acted as Young's distributor or sales agent, while the first informer identified Valenzuela as the one who procured the drugs to be sold. One informer described the presence of cocaine and marijuana at DiMatteo's house as late as 1982, and admitted that he himself purchased cocaine from DiMatteo during that year. The other informer described cocaine and scales at DiMatteo's house in 1979 through 1981, and a cocaine sale there in 1983.

This evidence of drug sales extending into 1983 was confirmed, and its implications were brought forward, by information obtained from toll records for Young's telephones covering the months of January through September, 1983, and by the notations supplied by the pen registers used from October 16, through December 10, 1983. Among the calls recorded, 180 were to six individuals with records of drug convictions over the period from 1973 to 1981. According to the affidavit, there were calls to business premises frequented by George T. Kattar, whom an informer identified as a financier of drug transactions, and 66 calls to an individual whose car had been driven to a meeting observed by the police in November 1983, where Young's wife and another woman traded briefcases under circumstances typical of an exchange of drugs and money.

██ The affiant supplemented these facts with his own opinion, based on his experience in drug investigation, that the telephones were being used in a manner typical of illicit drug transactions. The superior court could reasonably consider this conclusion as

support for the inference that illicit drug activities for which various named individuals had been convicted over a ten-year period were continuing into December of 1983. *See United States v. Webster,* 639 F.2d 174, 178 (4th Cir.), *cert. denied,* 454 U.S. 857 (1981), *modified on other grounds,* 669 F.2d 185 (4th Cir.), *cert. denied,* 456 U.S. 935 (1982) (where facts of affidavit indicate activity over protracted period, lapse of time from date of earlier facts is not necessarily an indication of stale probable cause). Thus, the issuing justice could properly infer that the activity "had not mysteriously stopped within the past month," after the pen registers had been removed. *See United States v. Hyde,* 574 F.2d 856, 865 (5th Cir. 1978). "Indeed, the very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future." *United States v. Steinberg,* 525 F.2d 1126, 1131 (2d Cir. 1975), *cert. denied,* 425 U.S. 971 (1976). In summary, the totality of the information was not stale, and the issuing justice had probable cause to infer that an interception would disclose the use of Young's telephone for communications about drug offenses. *See* RSA 570-A:9, III.

Before leaving the point we note that the foregoing summary omits any alleged misrepresentations, but does refer to three items of information that the defendants claimed to be inaccurate, not because they were misstated, but because the following, related information was omitted: Young was pardoned by the Commonwealth of Massachusetts following his 1974 drug conviction; the charges against his wife were dismissed for failure to prove her knowledge that the package she received contained drugs; and in the apparent drug deal, the individuals exchanged suitcases, not briefcases. These omissions do not, however, affect our result, for their inclusion would not have eliminated probable cause.

The remaining issues arise from the denial of motions to suppress evidence seized under the warrants to search the defendants' houses. To the extent that those motions rested derivatively on challenges to the legality of the telephone interceptions, the foregoing discussion supports the trial court's rulings. The suppression motions raise further questions, however, going to the character of the issuing magistrate and to the manner in which the police conducted the search of Young's house.

First, the defendants argue that *Gage,* J., who issued the warrants as Justice of the Exeter District Court, was disqualified to act, because he lacked the neutrality and detachment required of issuing magistrates by the fourth amendment of the Constitution

of the United States. *See Coolidge v. New Hampshire*, 403 U.S. 443, 449–53 (1971); *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). The argument rests on the fact that about eight hours before the judge was asked to issue the warrants in question he gave advice to members of the State police drug unit working on these cases. It seems that after the State police had arrested two individuals named Hollingworth and Kanigher on drug charges, one of the officers involved, Lieutenant Brown, called the judge to ask "what the recourse might be, if any, in not allowing [an arrestee] to make a phone call." The judge advised that the police might not be able to make evidentiary use of information obtained from the arrestees after the failure or refusal to allow a call. The defendants claim that the judge's response had the effect of placing him in the position of an assistant attorney general advising the police.

As against this claim, the superior court justice who heard the suppression motion found that Justice Gage's

> "comments to the police played no part in the preparation of the affidavits and indeed the defendants did not show whether the Judge even knew that the matter he discussed with Lt. Brown, and the matters dealt with in the affidavits were in any way related.
>
> \*　　\*　　\*　　\*
>
> There is nothing to even suggest that the magistrate was improperly influenced or prejudiced by his prior contact and conversation with the police. The magistrate in this case bore no relationship whatsoever to the prosecution and was in no way, improperly influenced."

█ █  These findings are dispositive on the outcome of the issue, although we should add a further word about it, with an eye to the future. Legal advice to police officers ought to come from city or county attorneys, or from the attorney general's office, not from judges. "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). Giving advice in the manner disclosed in this case places judicial neutrality at risk, with potentially appalling consequences, and such judicial responses to police questions generate issues on appeal that should never be allowed to arise. All of us in the judiciary should take care to avoid occasions for any more litigation about judicial detachment, here in the jurisdiction that produced *Coolidge*.

The second ground urged for suppressing the fruits of the search is statutory. The police arrived at each of the defendants' houses and began the searches on the morning of January 15, 1984; the police completed two of the searches that day, but searched Young's house continuously, day and night, until the evening of January 17. Because the warrant authorized only a "daytime" search, Young argues that the police violated the terms of the statute, which authorizes nighttime searches only "if the warrant so directs." RSA 595-A:2.

■ The argument may be answered shortly. The traditional reason for requiring explicit authorization for searches in the night is a sensitivity to what Judge Friendly described as "the peculiar abrasiveness of official intrusions" at that time. *United States v. Ravich*, 421 F.2d 1196, 1201 (2d Cir.), *cert. denied*, 400 U.S. 834 (1970). It is thus the entry of the police in the nighttime, not their mere presence, that is thought to call for particular judicial authorization, and the statute should be construed accordingly. The statute is therefore satisfied, as it was here, when execution of a warrant limited to a daytime search is begun during the daylight hours, even though the police presence may thereafter continue into or through the night for the purpose of completing the search lawfully begun. *See State v. Chaisson*, 125 N.H. 810, 819, 486 A.2d 297, 303 (1984) ("The police, in executing a search warrant for a dwelling, may remain on the premises only so long as it is reasonably necessary to conduct the search."). This result accords with federal cases decided under Federal Rule of Criminal Procedure 41; *see United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1977); *see also United States v. Joseph*, 278 F.2d 504, 505 (3rd Cir.), *cert. denied*, 364 U.S. 823 (1960).

Young raises his final evidentiary challenge in claiming that the police flagrantly disregarded the warrant's limitations on the objects of search and seizure, and thus proceeded from an initially lawful entry to a general search so unreasonable as to call for suppression of all items seized. *See United States v. Heldt*, 668 F.2d 1238, 1259 (D.C. Cir. 1981), *cert. denied*, 456 U.S. 926 (1982) (when search flagrantly disregards warrant's terms, all items seized may be subject to suppression). Although Young invokes both the National and State Constitutions, he does not independently address the latter. Since passing reference is insufficient to raise a State claim, *see State v. Dellorfano*, 128 N.H. 628, 632, 517 A.2d 1163, 1166 (1986), we treat this issue as arising solely under the fourth and fourteenth amendments.

Factually, the claim rests on the police's removal of quantities of papers, including personal letters, for examination after the search was over, and the seizure of a number of items never mentioned in the warrant, such as firearms and ammunition, without justification under the plain view doctrine. *See Coolidge v. New Hampshire*, 403 U.S. at 466. *Gray*, J., conducted an exhaustive suppression hearing and issued a detailed and meticulous order suppressing evidence he found to have resulted from abuse of the plain view doctrine and from the unjustified removal of papers without apparent evidentiary character. Young claims, however, that this was not enough, and that the entire search was so tainted by unwarranted breadth, that every item taken should be suppressed.

We address this claim, as the trial judge did, under the standard suggested in *Heldt*, which candidly confronted the difficulty of regulating the execution of warrants to search for documentary evidence of crimes. The court recognized that when the search under such a warrant is so poorly disciplined as to amount to "flagrant disregard" of the warrant's terms, the only appropriate remedy may be plenary suppression of all evidence seized. *Heldt, supra* at 1259. The specific issue here is whether the trial court could reasonably find that police error in executing the warrant did not rise to the level of flagrant disregard. On the persuasive authority of *United States v. Whitten*, 706 F.2d 1000 (9th Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984), we affirm the trial court's conclusion that it did not.

The instant case, like *Whitten*, involved a search for papers. In each, the police officers responsible for executing the warrant instructed their people on what to search for; in this case, they also told the searching officers to get advice from more experienced superiors when in doubt about the legality of taking any given item. In each case, however, the officers in charge stopped short of giving copies of the warrant to the officers who would make the actual search, and in each case, the latter improperly seized and removed voluminous papers for later examination into possible evidentiary value.

The facts did not result in a finding of flagrant disregard in *Whitten, supra* at 1010, and they do not compel one here. The instructions given to the officers were inadequate, but the trial court was entitled to make its finding that the dominant concern of the officers was to find the evidence they were authorized to seize. Nor was his finding that there was too much zeal and too little study inconsistent with his conclusion that execution of the

warrant was no mere subterfuge for a general search. As the *Heldt* court observed, "a good faith attempt to stay within the boundaries of an inherently broad search warrant will support a finding that the search—taken as a whole—was reasonable, even though a majority of documents seized might turn out not to qualify for inclusion on more leisurely reflection." 668 F.2d at 1269. Thus, the trial court could find in this case that particularized, rather than plenary, suppression was sufficient to vindicate the fourth amendment's mandate.

*Affirmed.*

THAYER, J., did not sit; BATCHELDER, J., dissented; the others concurred.

BATCHELDER, J., dissenting: I agree with the majority that the defendant has asked us to determine the scope of the protections under part I, article 19 of the New Hampshire Constitution by employing the reasonable expectation of privacy analysis in *Katz v. United States*, 389 U.S. 347 (1967). I further agree that this court has not yet decided that the *Katz* analysis reflects the content of article 19. *See State v. Kilgus*, 128 N.H. 577, 591, 519 A.2d 231, 240 (1986). Indeed, I have previously criticized the legitimate expectation of privacy analysis, at least as it relates to standing under article 19, as "no boon to the general administration of the criminal justice system . . . or clearly defined constitutional rights." *State v. Settle*, 122 N.H. 214, 219, 447 A.2d 1284, 1287 (1982). However, assuming, as does the majority, that an article 19 search is defined by *Katz*, I would conclude that the use of a pen register to monitor dialed telephone numbers is a search, and therefore must be based upon a finding of probable cause.

Part I, article 19 of the New Hampshire Constitution reads, in relevant part, that every person has "a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." This court has recognized that article 19 protects a citizen's right of privacy in his home. *State v. Chaisson*, 125 N.H. 810, 816, 486 A.2d 297, 301 (1984); *State v. Bradberry*, 129 N.H. 68, 76, 522 A.2d 1380, 1385 (1986) (Batchelder, J., concurring specially). Further, applying *Katz*, article 19 would extend to protect "people, not places," 389 U.S. at 351, and, more specifically, would protect information communicated by a person under certain circumstances against governmental intrusion. *Id.* at 353. Noteworthy as well is that in other contexts this court has articulated the extent to which the people of this State cherish their fundamental right to privacy. In *Hamberger v. Eastman*, 106 N.H.

107, 206 A.2d 239 (1964), a civil case establishing the tort of invasion of privacy, Chief Justice Kenison observed, in quoting Ezer, that "no right deserves greater protection, for, as Emerson has well said, 'solitude, the safeguard of mediocrity, is to genius the stern friend.'" *Id.* at 112–13, 206 A.2d at 242; Ezer, *Intrusion on Solitude: Herein of Civil Rights and Civil Wrongs*, 21 LAW IN TRANSITION 63, 75 (1961). Just as tort law protects the privacy interests of citizens against the intrusions of one another, so must the constitution protect the privacy interests of citizens against the intrusions of government.

The United States Supreme Court has already decided, in a much criticized opinion, that under the *Katz* analysis the use of a pen register does not constitute a search so as to give rise to the protections of the fourth amendment. *Smith v. Maryland*, 442 U.S. 735 (1979). The *Smith* court held that the defendant had no subjective expectation of privacy in the telephone numbers he dialed, nor an expectation of privacy that society is willing to recognize. *Id.* at 745. The Court rested this conclusion on the premise that a defendant voluntarily discloses such information to the telephone company, and therefore assumes the risk that the data will be relayed to a third party, including the government. *Id.* at 744.

The majority here recognizes the weaknesses in the subjective expectation of privacy inquiry in *Smith*, as well as the problematic assumption-of-the-risk analysis. The majority, however, does not abandon the notion, critical to *Smith*, that the defendant voluntarily disclosed the data to the telephone company. Relying on the so-called agent-informer cases, the majority concludes that disclosing telephone number data to the telephone company is equivalent to divulging criminal secrets to an untrustworthy, albeit law-abiding, confidant. I disagree that when one dials a telephone there is a voluntary disclosure of a magnitude similar to that in the agent-informer situation. It can be argued that the majority cannot avoid the assumption-of-the-risk analysis, but rely on the agent-informer cases—the very cases that establish the assumption-of-the-risk approach. *See United States v. White*, 401 U.S. 745, 752 (1971); *Hoffa v. United States*, 385 U.S. 293, 302–03 (1966), *reh'g denied*, 386 U.S. 940, 951 (1967); *Lewis v. United States*, 385 U.S. 706 (1966), *reh'g denied*, 386 U.S. 389 (1967); *Lopez v. United States*, 373 U.S. 427, 439 (1963). The concepts of voluntary disclosure and assumption of the risk are inextricably intertwined, and I am of the opinion that neither exists in this situation.

The telephone is a necessary, but not always welcome, component of modern life. It is an indispensable tool for effective communication in today's complex society. *People v. Sporleder*, 666 P.2d 135, 141 (Colo. 1983). When a telephone call is made, the speakers have a reasonable expectation of privacy in the content of their conversation, whether the call is from a home, office, or public telephone booth. *Katz*, 389 U.S. at 359. This expectation is protected in our wiretapping and eavesdropping statute, RSA chapter 570-A. In the words of the *Sporleder* court: "[t]he concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed . . . does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government." 666 P.2d at 141. Disclosure to the telephone company of the number dialed is "simply the unavoidable consequence of the . . . use of the telephone as a means of communication and the telephone company's method of determining the cost of the service utilized." *Id.* The necessary, nonvolitional disclosure of certain facts to the telephone company for the purposes of using an instrument of private communication does not require the assumption that the company will voluntarily share that information with others, especially the government. *Id.* at 142.

It is clear that a person has little choice about whether the telephone company will have access to the numbers he dials and the frequency with which he dials them. *Commonwealth v. Beauford*, 475 A.2d 783, 789 (Pa. Super. 1984), *appeal dismissed*, 496 A.2d 1143 (Pa. 1985). As Justice Marshall stated in his dissent in *Smith*, "whether privacy expectations are legitimate within the meaning of *Katz* depends not on the risks an individual can be presumed to accept when imparting information to third parties, but on the risks he should be forced to assume in a free and open society." 442 U.S. at 750 (Marshall, J., dissenting). "It is simply not enough to say, after *Katz*, that there is no legitimate expectation of privacy in the numbers dialed because the caller assumes the risk that the telephone company will disclose them to the police." *Id.* at 747 (Stewart, J., dissenting). I am convinced that a person using the telephone fully expects that the numbers he dials will remain as private as the content of the communication. The numbers provide a strong, sometimes conclusive, inference as to who is being called and with what frequency, unquestionably a private matter. A collection of such information can provide a virtual mosaic of a person's private life. *Sporleder*, 666 P.2d at 142. A person certainly evidences no intention "to shed his veil of

privacy" merely because he uses the telephone to make private contacts. *Beauford*, 475 A.2d at 789.

Although the foregoing provides support under the *Katz* analysis for requiring the use of a pen register to be based on probable cause, I believe the clear import of the language of article 19 mandates the same result. Article 19 protects a person's "papers" from all unreasonable searches and seizures. "Papers" as tangible objects, however, have little or no intrinsic value. The value of "papers" rests in the content of the information contained in them. The mere advance in technology from paper as the medium for the flow of information to, for example, telephonic communications should not alter the protective force of article 19. Similarly, article 19 should not be limited to protections against the intrusive capabilities of the government at the time of the adoption of article 19. Rather, the areas of protected privacy must be examined and determined on a case by case basis in light of the technology available to the government at any given time. The protected rights, of necessity, become more sharply defined as science and technology broaden the scope of governmental power. In the end, I see no functional difference between government officials searching for and seizing a person's papers, in the course of an investigation without the benefit of a warrant based on probable cause, and their monitoring the communicative activities of a citizen without the burden of similar requirements.

I would note finally that since the development of this case, the New Hampshire Legislature has amended RSA chapter 570-A specifically to authorize the installation and use of a pen register upon the satisfaction of certain procedural and evidentiary requirements. RSA 570-A:9-a (Supp. 1986). Although the statute permits a superior court judge to authorize such a use upon a showing of something seemingly less than probable cause, *see* RSA 570-A:9-a, II (judge must find that installation and use of pen register device is "reasonably calculated to further the investigation . . . ."), it is clear that the legislature has sought to provide further protection for the citizens of this State in the maintenance of the "proper balance between the State's duty to protect the public and the individual's right to privacy and free expression." *State v. Lee*, 113 N.H. 313, 315, 307 A.2d 827, 828 (1973) (articulating the purposes behind the wiretapping and eavesdropping statute). Because I think the use of a pen register requires a prior showing of probable cause, I do not think the legislature has gone far enough in safeguarding the privacy interests of New Hampshire citizens. Nevertheless, it has undertaken to preserve what it perceives as an

expectation of privacy in an area where the majority concludes that there is no such expectation.

I would hold, therefore, that a person does possess a reasonable expectation of privacy in the telephone numbers he dials, and that the use of a pen register to record such information is a search within the meaning of article 19. Accordingly, judicial authorization of the use of a pen register must be based upon a finding of probable cause. In this case, the defendants were entitled to have the information obtained through the use of the pen register and the fruits thereof excised from the supporting affidavits, and to have the probable cause determination based only on the remaining information.