608 A.2d 792

**STATE of Maryland**

v.

**Keith Gordon KLINGENSTEIN.**

**No. 170 Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 1, 1992.

326

Mary Ellen Barbera, Asst. Atty. Gen., Baltimore, argued (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellant.

Fred R. Joseph and Leonard R. Stamm, Greenbelt, argued (Joseph, Greenwald & Laake, P.A. and Goldstein & Stamm, P.A. on the brief), for appellee.

Argued before MOYLAN, BISHOP and BLOOM, JJ.

MOYLAN, Judge.

The appellee, Keith Gordon Klingenstein, is a registered pharmacist in Prince George's County. On March 22, 1991, the Grand Jury filed a 54–count indictment against him, charging the maintaining of a common nuisance and multiple instances of distributing a controlled dangerous substance; possessing a controlled dangerous substance with intent to distribute; failing to store drugs, medicines, and devices in a proper and safe manner; and aggregated theft of over $300.

The appellee moved to suppress all of the fruits of searches of 1) his pharmacy at 6201 Greenbelt Road executed pursuant to a warrant on October 12, 1990 and 2) his home at 9115 49th Place in College Park also pursuant to a warrant and executed the same day. Following a two-day suppression hearing, a Prince George's County judge grant-.

ed the appellee's motion to suppress all evidence seized from both pharmacy and home. By authority of Md.Cts. & Jud.Proc.Code Ann. § 12–302(c) (1974, 1989 Repl.Vol.), the State has appealed that suppression order. We hereby reverse it.

Two separate searches pursuant to two separate search warrants are involved. The warrant to search the pharmacy was issued by Judge David Gray Ross shortly before noon on October 12. The suppression hearing judge found, quite properly in our judgment, that there was no flaw in its issuance. The application established ample probable cause and the hearing judge so found. The command clause, moreover, was adequately particularized to limit effectively the scope of what would be done under the warrant and the hearing judge so found. The hearing judge ruled, however, that the *execution* of the warrant was flawed because the executing officers went beyond the scope of the warrant's authority.

The second warrant, for the search of the appellee's home, was issued on the late afternoon of the same day by Judge John F. Kelly, Sr. The hearing judge found fault neither with the execution of that warrant nor with its issuance, if the probable cause equation were to be evaluated strictly within the four corners of the warrant application. The hearing judge ruled, however, that fruits of the flawed search of the pharmacy fatally tainted the probable cause for the warrant to search the home. That second warrant to search the home, therefore, was invalidated as "the fruit of the poisonous tree."

### The Only Question is that of Sanctions

Before us are two doctrinally distinct search and seizure issues, each involving the selection of the appropriate sanction for a hypothesized Fourth Amendment violation. With respect to the search of the pharmacy, assuming that some items were seized within the authority of the warrant and other items seized beyond that authority, what is the appropriate sanction? With respect to the search of the home,

assuming that some tainted information entered into the warrant application, what is the appropriate sanction?

### *The Probable Cause Background*

Although the probable cause to support the warrant to search the pharmacy was undisputed, a brief recital of its highlights will set the stage for a better understanding of the searches that followed. On October 5, 1990, Trooper David Hammel, of the Drug Diversion Unit of the Maryland State Police, was contacted by a Washington County pharmacist and advised that two individuals had tried, unsuccessfully, to pass forged prescriptions for controlled drugs. The two suspects were shortly thereafter arrested at a Peoples Drug Store in Frederick as they persisted in their efforts to pass forged prescriptions. The suspects were Harold Brian Firor and John Andrew Hulse. Under interrogation by the State Police, both gave detailed statements about having obtained controlled substances from the appellee at the appellee's pharmacy in the College Park area. Both suspects informed the police that they had been obtaining drugs from the appellee regularly since 1987.

Part of the story that unfolded was that two Schedule III drugs: 1) Doriden, the trade name for glutethimide; and 2) Tylenol 4, containing a designated percentage of codeine, when used in combination with each other, produce an effect similar to that of heroin, an effect which can last for approximately twelve hours. The two drugs, in combination, are known on the street as a "max load." It was these drugs that Firor and Hulse had been attempting to obtain in Hagerstown and Frederick. It was these drugs that the two of them had been obtaining regularly from the appellee since 1987. The typical "max load" consisted of four Tylenol with codeine tablets combined with two Doriden (glutethimide) tablets. The prescriptions, therefore, were always for exactly twice as much Tylenol 4 as Doriden. Firor also indicated that he could regularly push a "max load" on the street for $35.

Firor elaborated on the *modus operandi* he used when obtaining drugs from the appellee's pharmacy. He would forge his prescriptions by making photocopies and taking them to the pharmacy. The password regularly employed to trigger the exchange consisted of asking the appellee, "Will $150 be enough?" The appellee would invariably give, by way of countersign, an exact price. Firor pointed out that the appellee would always wait until nobody else was in the drugstore before dispensing the drugs to Firor. Hulse verified in all details the information given by Firor.

In an effort to verify the information given by the suspects, Trooper Hammel, on October 9, began a series of attempted "controlled buys." On October 9, the first effort met with unexpected difficulty. In an undercover capacity, Trooper Margaret Shank attempted to have the appellee fill forged prescriptions for 1) Doriden, 2) Tylenol 4, and 3) penicillin. The prescriptions were in the name of Kim Firor and were photocopies of forms of a Dr. Lugener of Baltimore. There was, however, a Washington, D.C. address on the form that had been obtained from another prescription form and glued onto the Lugener form prior to photocopying. The appellee declined to fill the prescriptions for the Doriden and for the Tylenol 4, ostensibly because he was prohibited from filling Schedule III prescriptions that had been written in the District of Columbia. He did offer to fill the prescription for penicillin, however, but Trooper Shank declined to have that prescription alone filled. She indicated she would return with another prescription. The warrant application also suggested, however, an alternative hypothesis for the failure of that first attempt. Trooper Shank had failed to give the designated password; to wit, she did not tell the appellee that she had "one hundred and fifty dollars" and then ask him if that "would be enough?"

The investigative fortunes improved the following day, October 10, when Trooper Hammel met with a confidential informant, who represented incidentally yet a third source of information about the appellee's pharmacy. The confidential informant stated that he (or she) had been in the

pharmacy on several occasions and had obtained the two controlled dangerous substances under discussion in the proportions that have been discussed. The informant indicated that at one time the appellee had charged as much as $250 to fill such a set of prescriptions. The informant further stated that on every visit to the pharmacy, he had dealt exclusively with the appellee.

Trooper Hammel dispatched the confidential informant to the pharmacy with forged prescriptions for 1) Doriden, 2) Tylenol 4, and 3) penicillin, but this time in the name of another doctor with a Maryland address. Trooper Hammel, in plain clothes, followed into the pharmacy to monitor the proceedings. The appellee appeared unnerved at his presence. He stopped what he was doing, came over to the trooper, and asked if he could help him. Trooper Hammel purchased several meaningless items and left. Once the trooper was gone, the appellee filled the three prescriptions. The likelihood that the prescriptions were, indeed, forgeries was enhanced by the fact that they were written not on original doctors' forms but on photocopies of such forms. The relative quantities of the two drugs, moreover, were in precisely the proportion used on the street to produce a "max load." The thirty Doriden tablets and sixty Tylenol with codeine tablets that had been purchased were enough to produce fifteen "max loads," with the estimated street value of $525. Whatever purpose was served by the thirty penicillin tablets has not yet been revealed. The appellee charged the confidential informant $135 for the three prescriptions. A check with other pharmacies in the area yielded a more normal expected retail cost of $27. The appellee placed the orders in a prescription bag and handed it to the confidential informant, who turned it over to Trooper Hammel immediately after leaving the pharmacy. The prescription bag had no receipt attached to it and the labels on the prescription bottles were improperly filled out.

On the following day, October 11, Trooper Margaret Shank was successful in having the appellee fill forged prescriptions for precisely thirty Doriden tablets and sixty

Tylenol 4 tablets. On that occasion, Trooper Shank was careful to use the password. She informed the appellee that she "had $150 and wondered if that would be enough." He responded by pulling out a calculator and answering, "$127." On that occasion, the name used on the prescription forms was "Maria Firor," whereas on the preceding two days, the name "Kim Firor" had been used. Both Maria Firor and Kim Firor, however, were listed as living at the same address. Again on that occasion, the appellee did not provide the purchaser with a receipt. The customer, thereby, was furnished no tell-tale evidence of the inflated price charged to fill the order. On that October 11 controlled buy, Trooper Shank noticed that the prescription form for penicillin had not been signed. She, therefore, did not present that form to the appellee to be filled. For the other two prescriptions, she was charged $127.95 for drugs that, again according to a check with other pharmacies in the area, should have retailed for approximately $27.

The probable cause application also contained another interesting tidbit. The appellee's pharmacy had recently reported a breaking and entering to the Federal Drug Enforcement Administration. That report stated that various controlled dangerous substances had been stolen. There was, therefore, clear evidentiary support for a hypothesis that the appellee was attempting to create in advance an explanation, should one ever be needed, for either 1) the traceable appearance of certain controlled substances on the street or 2) the appearance of a suspiciously heavy commerce in certain drugs disproportionate to the volume of sales of other drugs.

In terms of probable cause, an ongoing pattern of likely criminal activity clearly emerged from 1) the information provided by Firor, 2) the information provided by Hulse, 3) the information provided by the unnamed confidential informant, and 4) the direct observations made in the course of the attempted and consummated controlled buys of October 9, October 10, and October 11. Forged prescriptions were regularly submitted to the appellee for thirty Doriden tab-

lets and sixty Tylenol 4 (with codeine) tablets, with or without an additional order of thirty penicillin tablets. The prescriptions were always presented directly to the appellee and filled by him only when his pharmacy was otherwise empty of customers. The password "Is $150 enough?" was regularly given and the countersign of calculating and quoting a precise price was regularly returned. Drugs of a retail value of approximately $30 were regularly sold by the appellee for approximately $135, a healthy markup for the criminal risk assumed. The drugs were then available for marketing, as "max loads," for a street value of $535, an additional $400 of profit for the street pusher. This pattern of criminality, or other similar patterns, had apparently been going on since 1987, a period of at least two years as measured from October, 1989.

The stage was thus set for the search of the pharmacy on October 12. As he moved toward the conclusion of the warrant application, Trooper Hammel averred:

"I am satisfied that there is probable cause to believe that there is now being concealed certain property, namely 'Glutethimide,' 'Codeine,' and 'Doriden' on the person/s premises above described ..."

The key directives of the Command Clause of the warrant itself were:

"C. Open and search any safe, box, bag, compartment, or thing in nature thereof, found in or upon said premises or person/s;

D. Seize all evidence, paraphernalia, controlled dangerous substance, and monies used in or incidental to the conduct or operation of controlled dangerous substance violations, found in or upon said premises, person/s...."

The hearing judge ruled that there was ample probable cause to support the warrant. He further ruled that the Command Clause was adequately particularized and limited in its scope. He interpreted the command to seize "all evidence, paraphernalia, controlled dangerous substance, and monies used in or incident to" the probable violations to

relate only to items in those categories that were somehow connected to the unlawful disbursing of the 1) Doriden, 2) Tylenol 4, and 3) penicillin referred to in the warrant application. In the last analysis, no fault whatsoever was found with the issuance *per* se of the search warrant. We think that ruling was eminently correct.

### The Execution of the Warrant

Trooper Hammel led the searching party. He was assisted by three other troopers. Because of the need to distinguish one drug from another and to determine which records and prescriptions related to particular drugs, the searching party was accompanied by Jack Freedman, a pharmacist and auditor from the Maryland Department of Health and Mental Hygiene. With minute determinations that had to be made with respect to the drugs themselves, vial by vial and box by box, and with similarly detailed determinations that had to be made with respect to prescriptions, receipts, drug order forms and other records, the completion of the search took over four hours.

In the course of the search, there was recovered a container of Doriden, five containers of Tylenol with codeine, and a container of penicillin. Numerous order forms, receipts, daily accounting forms, prescriptions, and other business records and inventories were recovered. Of unusual significance was a brown paper bag containing what appeared to be trash. An inspection of the bag, however, revealed $9,408 in U.S. currency. The bag was tucked away from the normal business records and common working area of the pharmacy. The currency inside the bag was wrapped in eleven bundles and rubber-banded together. One of the state troopers, in his subsequent application for a warrant to search the appellee's home, averred that from his experience and training, he knew that "this method of wrapping currency is indicative of individuals who are conducting illegal acts, mainly controlled dangerous substance violations. The ... method is used for easy counting and

exchange of currency between the distributor and the purchaser."

Because there has yet been no trial, it is difficult from our vantage point to predict precisely the value of the evidence recovered in the search of the pharmacy or to assess the precise nexus between it and the command clause of the warrant. From the characterization of some of that evidence in the subsequent application for the warrant to search the appellee's home, however, it is possible to extrapolate some evidentiary significance and some of the apparent nexus. From what seems to be a reference to the Doriden and the Tylenol 4, it may be inferred both that they were found 1) in excessively large quantities and 2) in unusual locations. Such observations would almost certainly be pertinent as proof of guilt:

> "Excessively large amounts of commonly abused Controlled Dangerous Substances which are sold and used on the 'street' were located within the pharmacy in places not normally associated with the common practices of a legitimate pharmacy."

The search for and seizure of various documents, moreover, apparently bore fruit in terms of corroborating the information from the various sources as to the regular *modus operandi* earlier recounted in the application for the warrant to search the pharmacy:

> "That during the execution of the aforementioned warrant numerous, obviously forged prescriptions, dating from early 1987 were found at the pharmacy. These documents further corroborate the statements given by the previously mentioned informants."

Whatever problem inhered in the execution of the search warrant occurred when Jack Freedman, the pharmacist and auditor with the Drug Control Division of the State Department of Health and Mental Hygiene, determined that the appellee's license to operate a pharmacy was going to be suspended. Accordingly, he directed the officers conducting the search to seize all Schedule II drugs. They did so. This aspect of the total seizure involved approximately 67

containers of pills. This was the aspect of the total seizure that the hearing judge found to have been beyond the scope of the command clause of the warrant.

The State argues that the command clause included the direction to seize all "controlled dangerous substances," which, by definition, included all Schedule II drugs. As the hearing judge interpreted the command clause, however, he read such general commands as those to seize "all evidence, paraphernalia, controlled dangerous substances, and monies" to be limited to those items in those categories that had a specific connection with the use of forged prescriptions to obtain Doriden, Tylenol 4, and penicillin, thus reading the command clause in conjunction with probable criminality spelled out in the warrant application. That was not an unreasonable reading of the command clause. Under such a reading, the seizure of the Schedule II drugs was not something particularly commanded by the warrant.

When read in conjunction, however, with the later allegation that "controlled dangerous substances of Schedule II were secreted in unlabeled prescription vials and found in unusual locations throughout the pharmacy which would be inconsistent with normal business practices," it is conceivable that the observations made by Jack Freedman and the subsequent seizures requested by him might have fallen within the legitimate coverage of the Plain View Doctrine. While properly executing the warrant to search for evidence of certain violations, observed evidence of other violations spotted in plain view would authorize the warrantless seizure of such evidence notwithstanding the fact that the other violations were not the subject matter of the search warrant itself. *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In this case, however, such an alternative theory was never urged by the State at the suppression hearing and a proper evidentiary predicate for it was obviously not offered. Under the circumstances, we will assume, *arguendo,* that the seizure of the Schedule II drugs was, indeed, a scope violation.

█ In concluding that the seizure of the Schedule II drugs was a scope violation, the fact that the seizing officers acted on the orders of Jack Freedman is a nonfactor. If the officers had seized something clearly beyond the scope of the command clause as reasonably interpreted, their *bona fide* belief that they were obeying the judicial commandment would not absolve them of constitutional sin, even had Jack Freedman never been along on the raid. Conversely, if they had seized something unequivocally directed by the warrant, their gratuitous confession that they had done so not in the service of the true warrant but in the service of a false god, would not invalidate their otherwise *objectively* reasonable behavior. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443, 456 (1989), *Maryland v. Macon*, 472 U.S. 463, 470–471, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370, 378 (1985).

█ The passing observation of the hearing judge, moreover, that "more than four hours was consumed in conducting this search" is also without significance. There is no remote suggestion that the officers had already found everything they were properly looking for under the warrant early in the course of the search and then deliberately dallied on a needlessly prolonged "fishing expedition." This was not a case where they were looking for some unique article of stolen property or some distinctive instrumentality of crime, the finding of which would trumpet the triumphal consummation of the search and call down an immediate final curtain. They were not looking, *inter alia*, for *some* Doriden and *some* Tylenol 4. They were looking for *all* of it. How else could they assess whether such drugs were present in inordinate quantity? The search for *all* Doriden, Tylenol 4, and penicillin required minute scrutiny—container by container—of all the chemicals in the pharmacy. The fact that some of the described drugs were found in strange and sundry corners, moreover, underscores their prudence in probing meticulously each nook and cranny. The necessity to pore over thousands of scraps of paper in quest of possibly forged prescriptions and of receipts, order forms,

and records pertaining to the Doriden, the Tylenol 4, and the penicillin made a painstaking and time-consuming examination inevitable.

The officers, as a matter of course, were required to look for any prescriptions made out to a customer bearing the name of "Firor." Quite reasonably, they would have been looking as well for any other prescriptions issued by doctors whose names had been listed as having issued any of the prescriptions to anyone named "Firor." The officers would also reasonably have been looking for any prescriptions at all made out on Xeroxed rather than on original prescription forms, as possibly forged prescriptions. They would, within the reasonable contemplation of the warrant, also have been looking for any prescriptions combining thirty Doriden tablets with sixty Tylenol 4 tablets, or, indeed, any prescriptions for those two drugs in other quantities but in the same proportion.

Realistically, the only practical way to have shortened the search would have been to have seized all of the drugs and then analyzed them in a more leisurely fashion at the police station and to have seized all of the documents and then perused them in a more leisurely fashion at the police station. Axiomatically, the briefer the search, the broader the necessary seizure; the longer the search, the narrower the possible seizure. As was observed in *United States v. Whitten*, 706 F.2d 1000, 1010 (9th Cir.1983):

"Although it may be intrusive for police officers to remain in a home and make a careful examination of items to determine whether they fall within the description of the warrant, it is equally intrusive for them to carry off papers and personal effects indiscriminately for later review."

The search in this case was essentially of the same duration as that search of a similarly complicated nature sanctioned by us and by the Supreme Court in *Andresen v. State*, 24 Md.App. 128, 331 A.2d 78 (1975), *aff'd, Andresen v. Maryland*, 427 U.S. 463, 467, 96 S.Ct. 2737, 2742, 49 L.Ed.2d 627, 634 (1976).

In affirming the hearing judge's ruling that the seizure of the Schedule II drugs was beyond the command of the warrant, the duration of the search is simply a nonfactor in our analysis. Given the hearing judge's reasonable interpretation of the command clause as read in conjunction with the warrant application, the seizure of the Schedule II drugs would have been a scope violation whether it occurred in the first two minutes of a ten-minute search or in the last two minutes of a four-hour search. If it was beyond the scope of the warrant's command, it was so whenever it happened, early or late.

What we are faced with, then, is a scope violation—but not one that in any way shocks the conscience. The command clause of the warrant had, indeed, mentioned the seizure of "all ... controlled dangerous substances." Schedule II drugs, by definition, are "controlled dangerous substances." Unlike the hearing judge, the executing officers failed to read the warrant application and the warrant in conjunction with each other, thereby limiting the seizable "controlled dangerous substances" to the two or three described in the warrant application. That, in the last analysis, was a Fourth Amendment violation on their part. It was by no stretch of the imagination, however, fraudulent, corrupt, outrageous, or flagrant.

### The Sanction for the Scope Violation

What, then, should the sanction for such more venial violation be? The Warrant Clause of the Fourth Amendment, of course, sets forth the necessary formalities of a valid warrant:

"[A]nd no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized*." (emphasis supplied).

The requirement of a particular description of the "things to be seized" is a mechanism whereby the Constitution ensures that even a search proper in its initiation not be

allowed to degenerate into a general rummaging about or fishing expedition. *Smith v. State,* 33 Md.App. 407, 409–410, 365 A.2d 53 (1976). This aspect of the particularity requirement was discussed in *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927):

> "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

The *Marron* opinion itself was the first occasion the Supreme Court had to discuss the particularity requirement and to consider an appropriate sanction for its violation. In terms of the search warrant being executed in that case, there was a clear scope violation. Prohibition agents had obtained a warrant for an establishment containing six or seven rooms at 1249 Polk Street in San Francisco. The warrant particularly commanded them to search for and seize "intoxicating liquors and articles for their manufacture." In a closet in one of the rooms, the agents noticed and seized a ledger, which was clearly neither intoxicating liquor *per se* nor an article or ingredient used in the manufacture of such liquor. An examination of the ledger, however, revealed inventories of liquors, receipts, expenses, and other business entries, including gifts to police officers. The ledger was, to say the least, an unexpected bonus and highly relevant evidence.

The central issue was the propriety of its seizure. The Supreme Court was unequivocal that the ledger, notwithstanding its evidentiary value, had not, even in general terms, been particularly described in the warrant and that it could not, therefore, be seized under the warrant. "And it is clear that the seizure of the ledger and bills, in the case now under consideration, was not authorized by the warrant." 275 U.S. at 198, 48 S.Ct. at 76. There was no suggestion, however, that the admissibility of intoxicating liquors, properly commanded by the warrant, was in any

way jeopardized by the scope violation with respect to the ledger. If the only legitimate theory for any Fourth Amendment activity had been the warrant itself, the case would have called for the admission of the intoxicating liquors but the exclusion of the ledger. Fortuitously, however, the Supreme Court was able to legitimate even the *warrantless* seizure of the ledger under an alternative theory of search incident to lawful arrest.

The utilization of the exclusionary sanction as a carefully controlled scalpel rather than as an indiscriminate blunderbuss has consistently been sanctioned by this Court. In *Spease and Ross v. State*, 21 Md.App. 269, 319 A.2d 560 (1974), *aff'd*, 275 Md. 88, 338 A.2d 284 (1975), we were dealing with the closely allied problem of an appropriate sanction for the hypothesized failure to minimize the seizure of conversations under the wiretapping and electronic eavesdropping laws. Central to that discussion was the analogy to particularity and minimization requirements under the Fourth Amendment proper. "Whether dealing with conversations or with tangible items, the issue is one of particularity—that language of the Fourth Amendment stating that the only valid warrants are those 'particularly describing ... the things to be seized.'" 21 Md.App. at 282, 319 A.2d 560. After having made the analogy, we went on to observe:

> "The great weight of authority and, in our judgment, the sounder reasoning maintains that the failure to minimize requires *only the suppression of those conversations which should not have been seized and not the suppression of those conversations which were appropriately seized.*" (emphasis supplied).

*Id.* In *Spease and Ross*, 21 Md.App. at 283, 319 A.2d 560, we quoted with approval *United States v. Lagorga*, 336 F.Supp. 190, 197 (W.D.Pa.1971) *aff'd*, 530 F.2d 965 (3d Cir.1976):

> "It seems clear under the general law of search and seizure that if some of the items obtained satisfy the requirements of the law, the mere fact that other objects

beyond the permissible ambit of the search must be suppressed, does not require that all of the evidence must be necessarily so treated."

The issue of fashioning an appropriate sanction for a possible scope violation was before us again in *Andresen v. State,* 24 Md.App. 128, 180–181, 331 A.2d 78 (1975), *aff'd, Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). In *Andresen,* we were dealing with two searches of a lawyer's legal office and his separate real estate office that consumed between four and five hours. Numerous documents were seized. The defendant there argued that the seizures had been so sweeping as to invalidate the entire execution of the search warrants. In concluding that a more narrowly fashioned sanction could properly distinguish between those items constitutionally seized under a warrant and those other items the seizure of which constituted a scope violation, we stated unequivocally at 24 Md.App. at 180, 331 A.2d 78:

"The appellant frames a final Fourth Amendment argument not in terms of those things 1) which were not suppressed and 2) which were admitted into evidence, but in terms of that much larger quantity of items which were seized initially but which did not pass through all of the screens. (A number of items which were not suppressed were not offered as evidence by the State because they related to other indictments against the appellant which had not yet come on for trial.) *The short answer to the contention is that even if other items had been unconstitutionally seized, that frailty would not mandate the suppression of the items which were constitutionally seized."* (emphasis supplied).

In affirming this Court, the Supreme Court adverted to this clear distinction between admitting those seized items that had been particularly described and suppressing other seized items which had not been particularly described:

"The record discloses that the officials executing the warrants seized numerous papers that were not introduced into evidence. Although we are not informed of

their content, we observe that *to the extent such papers were not within the scope of the warrants or were otherwise improperly seized,* the State was correct in returning them voluntarily and *the trial judge was correct in suppressing* others." (emphasis supplied). 427 U.S. at 481 n. 11, 96 S.Ct. at 2749 n. 11. The Supreme Court, however, approved, as had we, the admissibility of those other papers that had been adequately particularized.

We reverted to this question of whether the sanction for a scope violation should be a scalpel or a blunderbuss for yet a third time in *Shoemaker v. State,* 52 Md.App. 463, 485–486, 451 A.2d 127 (1982). In the course of executing a warrant, the searching party did, to be sure, seize a large number of items that had not been particularly described in the warrant. The claim was there made, as it had been in *Andresen,* that the overly broad sweep of the seizures called for the suppression of all seized items, even those that had been particularly described. In rejecting the blunderbuss approach for yet a third time, we held at 52 Md.App. at 485–486, 451 A.2d 127:

"The appellants claim that in addition to seizing the evidence of crime properly and particularly described in the warrant, the searching party also seized a number of other, innocuous objects such as receipts for repairs to various structures, warranties for household appliances, oil company credit cards, a prescription for eyeglasses, a Social Security card, a Blue Cross/Blue Shield card, and an engraved picture of a racehorse. They urge, with no direct authority to support them, that this calls for the suppression of even the properly seized evidence. Our answer once again lies in *Andresen v. State,* 24 Md.App. 128, 180, 331 A.2d 78 [ (1975) ], *cert. denied,* 274 Md. 725, *aff'd,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), which dealt with a remarkably similar set of facts and an almost identical claim:

'... even if other items had been unconstitutionally seized, that frailty would not mandate the suppression of the items which were constitutionally seized. If the

apples remaining in the barrel when it ultimately comes to rest upon the trial table are constitutionally healthy, it matters not how many constitutionally rotten ones were discarded along the way.'

See also *Spease and Ross v. State,* 21 Md.App. 269, 282–283, 319 A.2d 560, and cases cited therein."

*See also Brooks v. United States,* 416 F.2d 1044, 1049–1050 (5th Cir.1969); *United States v. Dzialak,* 441 F.2d 212, 216–217 (2d Cir.1971).

The law from the various United States Courts of Appeal on the appropriate sanction for a scope violation in the course of a warranted search is, with the exception of the rare and outrageous case where the entire execution of the warrant can be deemed either a subterfuge or a farce, in line with this more selective use of the exclusionary sanction—with what Justice Souter of the Supreme Court of New Hampshire (now of the Supreme Court of the United States) called, in *State v. Valenzuela,* 130 N.H. 175, 536 A.2d 1252, 1267 (1987), "particularized, rather than plenary, suppression."

The appellant seeks solace in *United States v. Rettig,* 589 F.2d 418 (9th Cir.1978), a case in which the 9th Circuit, speaking through Judge Kennedy (now Justice Kennedy), ordered total suppression. That case dealt with an extreme exception to the general rule and is not remotely apposite to the situation before us. That was a case where the entire warranted search in question was a subterfuge from its very inception. Agents of the Federal Drug Enforcement Agency in Los Angeles had been investigating Rettig for some time for importing cocaine into the United States from Peru. On April 2, 1975, they attempted to obtain from a federal magistrate both a warrant for his arrest and a warrant to search his Morro Bay residence. The federal magistrate issued the arrest warrant but declined to issue the search warrant, finding that the probable cause was stale.

The federal agents arrested Rettig on the following day, April 3, with the assist of a ruse. One of the agents made an anonymous call to Rettig "warning" him that federal officers were on the way with both an arrest warrant *and* a search warrant. When the arresting officers received no immediate response to their rap at the door, they forced their way into the house and went to the second floor, where they found Rettig attempting to flush marijuana down the toilet. He was taken into custody. While some agents remained on the premises, another made a second attempt to obtain a search warrant based upon the flushing incident at the time of arrest.

On that second occasion, however, the agent went to a state judge and applied for a warrant to search for evidence of *marijuana* possession. The state court judge was not informed of the unsuccessful attempt the day before to obtain a federal warrant to search for evidence of cocaine possession and importation. Both the warrant application and the warrant to search for evidence of marijuana possession, however, included such seizable items as cancelled mail, keys, rent receipts, utility bills, deeds, leases, and photographs, which unquestionably would have evidentiary value on the cocaine charges for which Rettig was subsequently prosecuted following that second search.

In ordering total suppression, the thrust of Judge Kennedy's opinion was that the failure of the agents to advise the state judge on April 3 of the unsuccessful attempt to obtain a federal warrant the day before transformed the entire warrant exercise of April 3 into a massive subterfuge. He pointed out, at 589 F.2d at 421:

"We think that in the hands of these agents the warrant issued on April 3 was used as an instrument for conducting the search for which permission had been denied on the previous day, a search that pertained to evidence of the cocaine charge, not to the possession of marijuana. In contrast to the affidavit filed with the state judge in support of the April 3 search warrant, the affidavit filed the day before with the federal magistrate

described in detail, in four pages of single spaced text, the elaborate scheme to smuggle cocaine from Peru, including preliminary flights from California to Lima, Peru by way of New York. The affidavit revealed plans to smuggle cocaine by using hollowed out chess boards, film canisters, false bottom suitcases, and a plan to dissolve cocaine in wine bottles and recover it once it had been imported. The affidavit further recited that during the conspiracy, and at the time of the affidavit, Rettig occupied the Morro Bay residence. The search that was conducted, and the items seized, were more pertinent to these matters than to the marijuana charge, and *we conclude that the search was for purposes and objects not disclosed to the magistrate.*" (emphasis supplied).

An interesting contrast is provided by *United States v. Heldt*, 668 F.2d 1238 (D.C.Cir.1981). *Heldt* recognized the *Rettig* exception that "in some cases a flagrant disregard for the limitations in a warrant might transform an otherwise valid search into a general one, thereby requiring the entire fruits of the search to be suppressed." 668 F.2d at 1259. It then went on to state the general rule:

> "Absent that sort of flagrant disregard, the appropriate rule seems to be that where officers seize some items outside the scope of a valid warrant, this by itself will not affect the admissibility of other contemporaneously seized items which do fall within the warrant."

*Id.*

Despite the extraordinary breadth of the search conducted in the *Heldt* case itself, the Court of Appeals for the District of Columbia held nonetheless that there was no "such flagrant disregard for the terms of the warrant which might make the drastic remedy of total suppression necessary." *Id.* The search was pursuant to three warrants for premises owned and operated by the Church of Scientology, one in Washington, D.C. and the other in California. Over 200 FBI Agents and other government personnel participated in the searches which lasted over twenty hours. At one of the California sites alone, thirty

rooms were searched as were hundreds of file cabinets, boxes, desks, and wall cabinets. Between 23,000 and 47,000 separate documents were seized. Of these, a bare 201 documents were singled out as pertinent evidence for use at the trial. The appellants sought to have all documents, including those 201, suppressed on the grounds that the general nature of the search cried out for total suppression. Despite the breadth of the search, the Court held that there was no flagrant disregard of the terms of the warrant so as to mandate total suppression.

In supplying guidelines for broad-scale document searches, *Heldt* strongly recommended that searching agents receive adequate preparation in knowing precisely what documents they are looking for. In the search before it, however, some fifty additional agents had arrived in mid-search at one of the complexes who had been "given neither a meaningful opportunity to read the warrant and affidavit nor any sort of comprehensive briefing of their terms, before beginning their mission." 668 F.2d at 1261. Notwithstanding that lack of preparation, the Court held:

"[O]n the whole, we conclude that the inadequate initial preparation of some agents, though disturbing, did not so taint this search as to convert it into a general rummage for evidence, and we therefore decline to order complete suppression on this basis."

668 F.2d at 1262.

In *United States v. Wuagneux*, 683 F.2d 1343 (11th Cir.1982), a searching team of between ten and twelve agents began a search on one afternoon that continued through the next day. The agents seized between 50,000 and 100,000 individual documents. The Court held that although scope violations occurred and many documents had been seized that were not particularly described in the warrant, total suppression was not called for:

"Appellant further argues, however, that a large proportion of the documents seized but not introduced in the government's case in chief were outside the scope of the warrant, suggesting that the search was so overbroad

that all the fruits of the search should have been suppressed. Total suppression may be appropriate where the executing officer's conduct exceeds any reasonable interpretation of the warrant's provisions. Courts have consistently held, however, that absent a 'flagrant disregard' of the terms of the warrant, *the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized."* (citation omitted) (emphasis supplied).

683 F.2d at 1354.

In *United States v. Tamura,* 694 F.2d 591 (9th Cir.1982), only selected exclusion rather than total exclusion was called for notwithstanding excessive scope violations in the course of executing a warrant. The searching team of a business office consisted of thirteen FBI Agents. The agents "concluded that it would take a long time to find all the records they were looking for unless [the suspect company's] employees helped them." 694 F.2d at 595. The agents threatened the employees that if they did not cooperate, the agents would seize all of the records in question. When the employees declined to cooperate, the agents seized "11 cardboard boxes of computer printouts, which were bound in 2000–page volumes; 34 file drawers of vouchers, also bound in 2000–page volumes; and 17 drawers of cancelled checks, which were bundled into files. The agents hauled all these records to another location, where they sifted through them and extracted the relevant documents." *Id.* The Court condemned the excesses. It disapproved of the indiscriminate seizure of all records:

> "[T]he wholesale *seizure* for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.' *We cannot sanction the procedure followed by the Government in this case."* (citation omitted) (footnote omitted) (emphasis in original) (emphasis supplied).

It further disapproved of the government's failure to return records promptly that had been improperly seized:

> "Moreover, it was highly improper for the Government to retain the master volumes as a means of coercing [the suspect company's] employees to stipulate to the authenticity of the relevant documents. *The Government's unnecessary delay in returning the master volumes appears to be an unreasonable and therefore unconstitutional manner of executing the warrant.*" (emphasis supplied).

694 F.2d at 597. Notwithstanding those excesses, the documents that had been properly seized were held to be admissible at trial and total suppression was deemed far too draconic a remedy:

> "Regardless of the illegality of the Government's seizure and retention of documents not covered by the warrant, however, reversal is not compelled in this case. All of the documents introduced at trial were seized and retained lawfully because described in and therefore taken pursuant to the valid search warrant. *Generally, the exclusionary rule does not require the suppression of evidence within the scope of a warrant simply because other items outside the scope of the warrant were unlawfully taken as well.*" (emphasis supplied).

*Id.*

In *United States v. Whitten,* 706 F.2d 1000 (9th Cir.1983), the Court roundly condemned a series of excessive scope violations in the execution of a warrant. The searching team of between ten and twelve agents were looking for evidence of who owned a house, lived in it, and received mail there. The agents ended up taking "more than a thousand photographs from the house." 706 F.2d at 1009. One agent explained that "he was trying to be selective but did not have time to go through all of the photos; he therefore took the lot intending to look through them more thoroughly later." *Id.* Two metal strong boxes were taken from a bedroom and their contents examined at the office of the Drug Enforcement Agency. The boxes contained such

extraneous items as "love letters, jewelry, marriage, divorce, and custody papers, a billing statement from a lawyer, a probation report, and form printed checks." *Id.* Underneath these items, however, the agents found drug paraphernalia and precursor chemicals.

The Court did not hesitate to condemn the excesses perpetrated in the execution of the search:

> "We disapprove the removal by the agents from the house of large quantities of papers, photographs, and other items which *might* have been relevant to who lived or worked there." (emphasis in original).

706 F.2d at 1010. It nonetheless carefully tailored its sanction to the suppression of those items that had not been particularly described, leaving unsuppressed those other items that had been properly searched for and seized:

> "Although the search was not scrupulously confined to the terms of the warrant, it does not follow necessarily that all of the evidence seized must be suppressed....
>
> ... *All of the items* seized at Midway Road and *admitted into evidence were things which the DEA agents were authorized to take under the warrant. The trial judge ordered the return of nonrelevant items.*" (citations omitted) (emphasis supplied).

*Id.*

In *Marvin v. United States,* 732 F.2d 669 (8th Cir.1984), the searching agents consisted of Internal Revenue Agents, directed to seize files bearing on tax returns for certain years from a chiropractic office. The alleged scope violations were well described by the 8th Circuit, at 732 F.2d at 674:

> "In executing the warrant the agents seized a large number of file folders for later examination and copying of financial information. The agents removed entire patient files rather than segregate financial information at the clinic. Some files were seized that did not contain any financial information. Other files were taken that contained records dated before or after the period speci-

fied in the warrant, records belonging to other doctors, and personal correspondence and other items belonging to the Marvins."

The District Court ordered the IRS to return documents that did not reflect income or expenses for the four tax years specifically referred to in the warrant application and the warrant itself. The government did not challenge the District Court's order to return these records. The 8th Circuit accepted the ruling that there had been scope violations, *arguendo*, but nonetheless ruled that that fact would not mandate the total suppression of all seized items, including those that had been particularly described in the command clause of the warrant:

> "Even if there was an unlawful seizure beyond the limitations of the warrant, a question we do not reach, the Marvins have not made a sufficient showing to require that all documents seized during the search of the clinic be returned. *Unlawful seizure of items outside a warrant does not alone render the whole search invalid and require suppression and return of all documents seized, including those lawfully taken pursuant to the warrant.*" (emphasis supplied).

*Id.*

The 2nd Circuit joined this chorus in *United States v. Matias,* 836 F.2d 744 (2d Cir.1988). The search warrant was for evidence relating to the unlawful manufacture of cocaine-based products. The command clause of the warrant was aimed primarily at chemicals containing cocaine and other powders and dilutents used to mix cocaine, as well as paraphernalia used in the packaging of cocaine and related products. The command clause also included, however, currency and other valuables and any documentary evidence bearing upon the offenses. Matias urged that the wholesale seizure of books and records, including personal photographs, transformed the search into a general one, thereby mandating the total suppression of everything seized under the warrant. In rejecting the claim, the 2nd

Circuit joined the universal chorus as to the appropriate reach of the exclusionary sanction for a search violation:

> *"[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search.* Courts have also indicated that the drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." (citations omitted) (emphasis supplied) (emphasis in original).

836 F.2d at 747.

A second occasion on which a United States Court of Appeals found such a flagrant disregard of the terms of a warrant as to merit total suppression was *United States v. Medlin*, 842 F.2d 1194 (10th Cir.1988). As in the first such instance, *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978), the holding was based upon a finding that the entire search, from its inception, had been in significant measure a subterfuge. In Osage County, Oklahoma, agents of the Alcohol, Tobacco and Firearms Bureau (ATF) obtained a warrant to search a private home for illegally possessed and stolen firearms and for records pertaining to those offenses.

The culprit in the execution of that search warrant was a deputy sheriff from neighboring Tulsa County. It was the deputy sheriff who supplied information from a confidential informant to the effect that Medlin possessed the contraband firearms at his residence. The deputy, however, had also obtained information from the informant that Medlin possessed a wide variety of other stolen goods taken in a series of state crimes. The deputy did not pursue that investigation of state crime directly by applying for a search warrant, however, because of his poor working relationship with officials in Osage County. His ploy, rather, was to pass on the information with respect to firearms to ATF and then to go along with them on their raid. He "piggy-backed" on their entry but then marched to the sound of a different drum in looking for and seizing stolen

items utterly unrelated to firearms. He ultimately seized 667 such items.

When the case first came before the 10th Circuit, the Court remanded for a further evidentiary hearing to explore whether the deputy sheriff had so manipulated events as to create a pretext for the search he was reluctant to pursue independently:

> "Because of the large number of seized items not listed in the warrant,[1] it is possible the police used this warrant as a pretext for a general search, which would taint the whole search."

*United States v. Medlin,* 798 F.2d 407, 411 (10th Cir.1986).

Upon remand, the district judge found that the search warrant was a pretext arranged by the deputy sheriff, although it was not necessarily so in the minds of the ATF Agents who had been the deputy's perhaps unwitting instruments. The district judge found that this was not an excess of zeal arising spontaneously in the course of an otherwise proper search but "an unauthorized activity which Deputy Carter had planned when he accompanied the ATF Agents on their authorized search for firearms." 842 F.2d at 1197. He further found that the deputy had "employed the execution of the federal search warrant as a 'fishing expedition.'" 842 F.2d at 1199. The 8th Circuit could not "say that these factual findings [were] clearly erroneous," *Id.,* and, therefore, affirmed the total suppression.[2]

Back in the mainstream, *United States v. Young,* 877 F.2d 1099 (1st Cir.1989), was a case involving a massive scope violation. Young's home was being searched pursuant to a warrant directing the officers to search for evi-

---

**1.** It is to be noted that "the large number of seized items not listed in the warrant" did not establish a flagrant impropriety *per se* but only suggested the possibility that the warranted search was being used as a pretext for a more general search.

**2.** The 8th Circuit noted, as we have noted here, that "the Government has not here relied on plain view."

dence of marijuana, cocaine, and related records and paraphernalia. While the search was in process, an IRS Agent heard about it and "crashed" the searching party. He seized "ten file drawers of records from the [garage] office ... and later inspected them at State Police offices." The trial judge found that there had been a clear scope violation and suppressed all of the records seized by the IRS Agent for tax purposes. He declined, however, to suppress the evidence of drug violations properly seized under the warrant. The 1st Circuit affirmed that particularized exclusion:

"Second, although Agent Blair seized many items outside the warrant's scope, '[u]nlawful seizure of items outside a warrant does not *alone* render the *whole* search invalid and require suppression and return of *all* documents seized, *including those lawfully taken pursuant to the warrant.*'" (emphasis in original).

877 F.2d at 1105. *See also United States v. Lambert*, 887 F.2d 1568, 1572–1573 (11th Cir.1989).

Although it handled the contention summarily, the Supreme Court, in *Waller v. Georgia*, 467 U.S. 39, 43 n. 3, 104 S.Ct. 2210, 2214 n. 3, 81 L.Ed.2d 31, 37 n. 3 (1984), affirmed the decision of the Georgia Supreme Court to deal with a scope violation in a warranted search through particularized exclusion rather than plenary exclusion:

"Petitioners' second Fourth Amendment challenge is that police so 'flagrant[ly] disregard[ed]' the scope of the warrants in conducting the seizures at issue here that they turned the warrants into impermissible general warrants. Petitioners rely on lower court cases such as *United States v. Heldt* and *United States v. Rettig*, for the proposition that in such circumstances the entire fruits of the search, and not just those items as to which there was no probable cause to support seizure, must be suppressed.... The Georgia Supreme Court found that all items that were unlawfully seized were suppressed. In these circumstances, there is certainly no requirement that lawfully seized evidence be suppressed as well." (citations omitted).

■ Both the broad mainstream of case law, where particularized exclusion is an adequate sanction, and the rarer instances of "flagrant abuse," where plenary exclusion is the necessary sanction, share the common denominator of some excess perpetrated during the execution of a warrant. "Excess," however, is a relative term. In determining the appropriate breadth of the sanction, the critical distinction is between 1) an instance of "the tail of the dog wagging excessively beyond the scope of its handler's command," on the one hand, and 2) the far different instance of "the tail actually wagging the dog," on the other hand. The distinction is not one that can be measured quantitatively, simply by counting and comparing the properly seized items with those improperly seized. It is a distinction, rather, between dominant purposes—between 1) seizures beyond the warrant's command attributable to honest mistake, excessive zeal, or even spontaneous opportunism, on the one hand, and 2) seizures beyond the warrant's command actually anticipated and intended by the searching officer, on the other. The question is whether the scope violation was a secondary incident of the search or its primary purpose.

■ The search warrant for the appellee's pharmacy in this case was not a pretext. The seizure of the Schedule II drugs, directed by Jack Freedman, was, in its worst light, a secondary incident of the search and not its primary purpose. Even if the tail wagged excessively, this was still not a case of the tail wagging the dog. The moving force behind this search was Trooper Hammel, not Jack Freedman.

We hold, therefore, that the order of the hearing judge directing the total exclusion of all items seized in the search of the appellee's pharmacy was in error and is hereby reversed. Necessarily, the case will have to be remanded for a determination of which seized items were clearly beyond the scope of the warrant's command or were not otherwise seizable, which items should be excluded from evidence and returned to the appellee, and which other seized items fell within the warrant's command or were

otherwise properly seizable, which items should not be suppressed.

### The Search of the Home: "Poisoned Fruit" or "Independent Source"?

A review of the second exclusionary sanction directed at the search of the appellee's home involves a very different type of Fourth Amendment analysis.

The hearing judge ruled, quite properly we think, that there was no flaw either in the execution of the warrant to search the home or in its issuance, were the appraisal of probable cause to be confined to the four corners of the warrant application. The application incorporated the earlier application to search the pharmacy and then, simply by way of highlighting, independently repeated some of that probable cause. Utilizing the expertise of Trooper Hammel on the usual patterns of where evidence is likely to be found in cases of ongoing commercial operations such as this, the warrant application for the search of the home demonstrated that documentary evidence of the criminality would quite likely be found there. In terms of the predicate criminality itself, all of the probable cause that we have already discussed—emanating from Harold Brian Firor and John Andrew Hulse, from the confidential informant, and from the three attempted and consummated controlled buys—supported the search of the home as well.

Attached to the warrant application for the search of the home, however, was also the inventory sheet showing what had been recovered in the search of the pharmacy. In addition, several brief references were made to items recovered in the course of the first search. The hearing judge held that because tainted information had gone into the application for the search of the home, the entire search must be suppressed as the "fruit of the poisonous tree."

We hold that that ruling was in error. As *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), made indisputably clear, one rotten apple (or even

many rotten apples) will not presumptively contaminate the entire barrel. In *Franks*, of course, the allegation was that a perjurious affidavit had tainted the application for a search warrant. On the threshold issue of whether a "taint" hearing was even mandated to examine the truth of such allegation, the Supreme Court held that if the tainted or perjurious information was not critical to the establishment of probable cause, the issue was moot. What the court must do is to factor out the allegedly tainted information and then measure the remaining untainted information. If what remains is, in and of itself, enough to establish probable cause, the allegedly tainted information is reduced to surplusage and its presence, tainted or untainted, becomes utterly immaterial. As the Supreme Court stated, at 438 U.S. at 171–172, 98 S.Ct. at 2684:

> "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." (footnote omitted).

The Court asserted the same principle in more affirmative terms, at 438 U.S. at 156, 98 S.Ct. at 2676:

> "[I]f the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

*United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), was a case where the outcome was directly controlled by the *Franks* principle. Two defendants had standing to contest the search of a home in Taos. The warrant to search that home, as the warrant here, was,

judged within its four corners, unexceptionable. Into the application for that warrant, however, had gone two unconstitutional monitorings by a beeper device, which represented intrusions into constitutionally protected places owned by the two defendants. The results of those Fourth Amendment intrusions were tainted. In refusing to invalidate the subsequent search warrant, however, the Court reiterated that unless the tainted material is indispensable to the establishment of probable cause, its presence is not fatal. The Court reasoned, at 468 U.S. at 719, 104 S.Ct. at 3305:

> "That information, which was included in the warrant affidavit, would also invalidate the warrant for the search of the house if it proved to be critical to establishing probable cause for the issuance of the warrant. However, if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid."

We ourselves observed in *Anne Arundel County v. Chu,* 69 Md.App. 523, 534 n. 5, 518 A.2d 733 (1987) *aff'd, Chu v. Anne Arundel County,* 311 Md. 673, 537 A.2d 250 (1988):

> "*Franks v. Delaware* ... establishes ... that even when tainted information is contained in a warrant application, the remaining untainted information ... still must be appraised to see whether it alone might suffice to establish probable cause."

*See also Yeagy v. State,* 63 Md.App. 1, 8–10, 491 A.2d 1199 (1985); *Wilson v. State,* 87 Md.App. 659, 667–668, 591 A.2d 524 (1991).

The *Franks v. Delaware* technique of factoring constitutionally tainted material out of the warrant application and then assessing the remaining untainted information to see whether it, alone, establishes probable cause is but an instance of a broader phenomenon. The broader phenomenon is the so-called "independent source" exemption from the exclusionary sanction of the "fruit of the poisonous tree" doctrine.

The "fruit of the poisonous tree" doctrine holds that when the Fourth Amendment has been violated in obtaining evidence, such tainted evidence shall not only not be used directly but shall not be used at all. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). It prohibits not only the direct use of the tainted evidence but also its derivative use. *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). A scope violation in the course of the execution of a search warrant would represent, for example, such a constitutional violation. Ordinary exclusionary principles would bar the direct use of the evidence at trial. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The "fruit of the poisonous tree" doctrine would go further and also bar such derivative uses of such evidence as the exploitation of the knowledge gained so as to develop further leads, *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); or, of pertinence here, the use of such tainted evidence to establish probable cause for the issuance of a subsequent warrant. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The direct use of the exclusionary sanction is easy because a one-to-one relationship between the violation and its exploitation is clear. The application of the exclusionary sanction to derivative evidence, however, requires the establishment of a cause-and-effect relationship between the poisonous tree and its alleged fruit. The peril to be avoided is an indiscriminate lapse into the logical flaw of *post hoc; ergo, propter hoc* ("after this; therefore, because of this").

As a consequence of this caution, there have developed three well-established exemptions from exclusion under the "fruit of the poisonous tree" doctrine. They are sometimes referred to, in a commonplace flight of rhetoric, as "three ways of unpoisoning the fruit." More aptly, they are three ways of determining that the fruit was not poisoned in the first instance. One of these, not here pertinent, is the "attenuation of taint." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Another, also

not here pertinent, is "inevitable discovery." *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

■ The third of the exemptions, the one that concerns us in this case, is that of "independent source." *United States v. Wade*, 388 U.S. 218, 239–242, 87 S.Ct. 1926, 1938–1940, 18 L.Ed.2d 1149, 1164–1166 (1967). That a constitutional violation preceded the discovery of the evidence in question does not establish that the constitutional violation caused the discovery. The time sequence does, indeed, establish a presumption to that effect. The State is given the opportunity, however, to demonstrate that the evidence proceeded from an independent source. *United States v. Wade*, 388 U.S. at 239–242, 87 S.Ct. at 1938–1940 (even following a tainted pretrial identification, an in-court identification is admissible if it is the result of the identifying witness' independent memory from the crime scene); *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (search warrant issued after unlawful entry into home is not tainted if no knowledge from the unlawful entry entered into the application for the search warrant); *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (issuance of a valid search warrant was wholly independent of an initial illegal entry into a warehouse).

■ *Franks v. Delaware* is but a variation on this theme. Notwithstanding the presence of tainted information in a warrant application, the adequacy of the remaining untainted information to establish probable cause is, *ipso facto*, an independent source for the issuance of the warrant. Under the circumstances, whether the tainted information does not appear at all, *Segura v. United States, supra; Murray v. United States, supra*, or does appear, but only as nonpivotal surplusage, is inconsequential. The untainted information is a legally sufficient, energizing predicate for the issuance of the warrant, regardless of whether it stands alone or in tainted company.

Applying the *Franks v. Delaware* principle to the search of the appellee's home yields a simple conclusion. The mention in the warrant application for the home that Schedule II drugs had been recovered in the search of the pharmacy was not an indispensable or pivotal component of probable cause. It was a *de minimis* triviality. Remaining, untainted information abundantly established probable cause for the search of the appellee's home. In all likelihood, if we factored out the very fact that the pharmacy had ever been searched, the probable cause for the search of the home would not be fatally eroded. *A fortiori*, factoring out the passing mention of those items seized that were a scope violation would not fatally erode that probable cause. There was no justification for the invalidation of the warrant to search the home and for the suppression of its fruits.

SUPPRESSION ORDER FOR SEARCH OF APPELLEE'S HOME VACATED; SUPPRESSION ORDER FOR SEARCH OF APPELLEE'S PHARMACY VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.